The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY

v.

The UNITED STATES.

No. 417–74.

United States Court of Claims.

March 22, 1978.

Martin Sterenbuch, Washington, D. C., for plaintiff; Gajarsa, Liss & Sterenbuch, Washington, D. C., of counsel.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before NICHOLS, KASHIWA, and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Kenneth R. Harkins, filed May 31, 1977, pursuant to Rule 134(h), having been submitted to the court on oral argument of counsel and the briefs of the parties.

The case concerns 41 disputed charges for carriage of Government property by rail. As is usual, the Government paid the charges, but on determining they were excessive via General Accounting Office post-audit, recovered the amounts by deductions from sums otherwise due. Sixteen items have been settled, on which plaintiff is due $5,005.24. The remainder concern the proper rates applicable to transcontinental shipments of Government automobiles, the movement of which was interrupted by storage in transit (SIT).

Under 49 U.S.C. § 22, railroads can legally quote favorable rates and services to the Government and certain other congressionally favored categories of shippers, that are not available to shippers generally, without incurring charges of illegal discriminations. Quotation 61–D was made under this authority. While other transcontinental shippers are sometimes allowed to enjoy SIT stoppage at certain specified points, under regular published tariffs, while paying through rates, quotation 61–D makes other SIT points available to the Government. It does not give any rates, in money terms, nor state expressly what commodities it applies to; except for certain exclusions not here applicable. Defendant argues, in substance, that it makes through rates available, despite SIT at the stated points, to all Government shipments not excluded by quotation 61–D's own terms. Plaintiff argues, in substance, that quotation 61–D makes through rates available to the Government for transcontinental shipments, despite SIT, only when such privileges are offered commercial shippers of merchandise having the same classification. Thus, plaintiff says, if through rates despite SIT are denied commercial shippers of any type or kind of article, they are likewise denied the Government when it ships the same thing.

Commercial transcontinental shipments of automobiles would be denied the combination of through rates with the SIT privilege by footnotes to published tariffs governing through automobile shipments, which typically provide:

> Rates subject hereto do not apply on shipments that are accorded storage-in-transit privileges as published in tariffs lawfully on file with the Interstate Commerce Commission.

Defendant denies that section 22 quotations are "tariffs lawfully on file with the Interstate Commerce Commission," but it appears they fit all the specifications of those footnotes, separately stated: they are tariffs, they are lawful, and they are stipulated to be on file with the Interstate Com-

merce Commission as the law requires. Accordingly, we hold that the footnotes apply to these section 22 quotations. By stipulation of the parties, paragraph 12, this is the principal issue in the case. A holding for plaintiff does not make quotation 61–D a nullity, because there are plenty of commodities other than automobiles as to which commercial shippers would enjoy the combination of SIT, at certain points, with through rates, and quotation 61–D would extend to the Government the use of SIT, at other points, with the same through rates. In the absence of a through rate, defendant would of course have to pay, as would a commercial shipper, the rate from origin to the SIT point, plus the rate from the SIT point to destination. The sum of these would, we suppose, always exceed the through rate from origin to destination.

Thus, our holding is, in terms of the stipulation, that a section 22 quotation is a "tariff lawfully on file with the Interstate Commerce Commission" within the meaning of the involved footnotes. It follows that plaintiff prevails.

This no doubt oversimplifies the case, which embodies other ramifications, of a nature to delight the lovers of complexity in legal adjudication. We leave them to the trial judge's able opinion and findings, which the court affirms and adopts as its decision in the case. The opinion is hereinafter set forth, but the findings, though adopted, are not printed since such facts as are necessary to the opinion are contained in the opinion. The findings have been furnished to the parties.

The court concludes as a matter of law that plaintiff is entitled to recover on items 5, 7, 8, 13, 16, 17, and 20 through 38, inclusive, and judgment is entered to that effect. Plaintiff is to recover from the United States the net amount of $5,005.24 on the items not in dispute; the sum of $17,570.93 on the 24 eastbound disputed shipments; and the sum of $2,793.50 on the disputed westbound shipment, a total of $25,369.67.

The trial judge's opinion follows:

HARKINS, Trial Judge: This case is concerned with freight transportation services provided by plaintiff to the Government during the period 1969–72. Of the 41 items that were initially in dispute, 16 have been resolved by stipulation, and on these items plaintiff is due $5,132.21 while defendant is due $126.97. The net amount due plaintiff on the settled items is $5,005.24. The 25 remaining disputed items are concerned with the proper transcontinental freight rates to be applied to carload shipments of Government automobiles that were accorded storage-in-transit (SIT) privileges. Plaintiff seeks to deny to defendant per-car through rates established in relevant tariffs on the ground that footnotes in the tariffs excluded per-car through rates "on shipments that are accorded storage-in-transit privileges as published in tariffs lawfully on file with the Interstate Commerce Commission." Defendant contends that section 22 quotations gave the Government storage in transit at the tariff per-car rates.

Each of the tariffs and section 22 quotations involved in this case was lawfully published and duly on file with the Interstate Commerce Commission. The issue is whether storage in transit at military installations, pursuant to the section 22 quotations in this case, can be used in connection with the per-car through rates that are denied to non-Government shippers by the footnotes published in the tariffs. Plaintiff's contention that the per-car through rate is not available is correct.

Storage in transit is a privilege frequently granted by railroad carriers to shippers, but which normally is not provided by motor carriers. SIT allows a shipment to be physically unloaded at an intermediate point between origin and final destination, to be put into storage at such intermediate point, and subsequently to be loaded on another railroad car to be moved to final destination. SIT permits the applicable rate to be "protected" in that the rate is the same that would apply if the shipment moved from initial origin to final destination without interruption.

Commercial shippers obtain SIT through the relevant tariffs, and, as a shipper, the Government would be eligible for the tariff SIT. Tariffs, however, do not afford SIT at transit points adjacent to military installations, or sufficiently close to such installations so as to be convenient for Government use. A section 22 quotation is the mechanism by which the Government and certain other categories of shippers are given discriminatory or preferential treatment that is prohibited to be given to commercial shippers. The section 22 quotations in this case accorded SIT for Government shipments at special transit points convenient to Government installations. In addition, although the minimum protected through rate applied only to a 12-month storage period at the transit points, the quotations also permitted the Government shipments an extended storage period of 4 years, rather than the customary 1-year period offered commercial shippers.

Although the shipments involved in the disputed items occurred in the period 1969–72, the applicable commodity tariffs and the section 22 quotations that are required to be construed have a history of many reissues and amendments. The historical development of these contractual instruments is relevant to an understanding of the present controversy.

Facially, the terms of the relevant tariffs and quotations, when considered independently of each other, are not ambiguous. In structure and in terms, however, the instruments relative to the eastbound shipments differ from those relative to the westbound shipments insofar as SIT for transcontinental automobile freight is concerned. The intent of the parties, while controlling, is not apparent from an examination of only the tariffs and quotations. Accordingly, a perspective on the contractual intent requires an examination of the arcane processes by which railroad rates and quotations are generated under the Interstate Commerce Act.

The remaining disputed items are concerned with 24 eastbound and 1 westbound transcontinental automobile shipments.

The eastbound shipments moved from Oakland, California, to SIT at Avondale, Colorado, and to final delivery at Killeen, Texas. The westbound shipment moved from Highland Park, Michigan, to SIT at West Yermo, California, and to final delivery at Ranch House, California.

The tariff applicable to the eastbound shipments is TCFB Freight Tariff 2–H (Tariff 2–H) and the applicable section 22 quotation is JOINT EWS–ICC No. 111, Amendment No. 38, entitled "Storage in Transit of Government Traffic Imported or Returned from Overseas" (Quotation 61–D). Tariff 2–H, in relevant part, provides three transcontinental per-car automobile freight rates: freight on single-deck flat cars, on bi-level cars, and on tri-level cars. The footnote in question, footnote 3, applies to each type of car. Quotation 61–D, on the other hand, excepts from the traffic eligible for storage-in-transit privileges "shipments moving on bi-level or tri-level cars to or from the transit point." Only shipments on flat cars, accordingly, are eligible under Quotation 61–D for SIT at the transit points listed.

The tariff applicable to the westbound shipment is TCFB Freight Tariff No. 1–Q (Tariff 1–Q) and the applicable section 22 quotation is T.C.F.B.–I.C.C. No. 448, entitled "Storage in Transit at Nebo or West Yermo, Cal., on Commodities, Except Ammunition, Explosives, and Other Articles of Ordnance" (Quotation 263–C). Tariff 1–Q publishes automobile transcontinental per-car rates in part 7 for shipments on bi-level or tri-level cars and in part 15 for shipments on single-deck flat cars. The footnote in question, footnote 60, applies only to the per-car rates for bi-level or tri-level cars; note 60 does not apply to the per-car rates for flat car shipments of automobile freight. Quotation 263–C, unlike Quotation 61–D, does not exclude shipments on bi-level or tri-level cars, and the SIT privilege is available for automobile freight shipments on all three types of equipment.

Quotation 263–C applies to transcontinental traffic destined for certain points in California and allows SIT at Nebo and

West Yermo, California, only. Quotation 61–D, on the other hand, applies to Government traffic imported or returned from overseas, whether through East Coast, Gulf Coast, or West Coast ports, and allows SIT at 60 transit points located throughout the United States. Avondale, Colorado, and West Yermo, California, are included as transit points.

Rates and services for railroad transportation regulated by the Interstate Commerce Act are provided under a system whereby the railroads, through private organizations which operate as agents for the carriers involved, agree upon charges and conditions of service. Rate and service schedules (tariffs) are the product of joint carrier action, pursuant to section 5(1) of the Interstate Commerce Act; quotations to the Government are the product of joint carrier action pursuant to the authority contained in section 22(2) of the act.

"Bureau action" refers to the process by which the carriers jointly consider rate and service matters. In broad outline, the United States is divided geographically and each area is served by a rate bureau composed of the railroads that operate in the particular area. Transcontinental rates are the rates for shipments whose origin and destination points are on opposite sides of the Rocky Mountains. The Trans-Continental Freight Bureau (TCFB) is composed of eight member lines with voting rights; it includes additional lines without voting rights. The bureau, headquartered in Chicago, Illinois, is totally financed by the member carriers and its function is to provide a clearing house for rate adjustments that affect the members. Both the westbound and eastbound tariffs involved in this case were produced by the Trans-Continental Freight Bureau.

Section 22 quotations are the product of joint carrier arrangements and may be offered by a rate bureau or by other carrier organizations, such as an association. A railroad association differs from a rate bureau in that it is an organization whose membership represents a larger section of the country. The Western Railroad Traffic

Association, here involved, is an organization composed of from 30 to 35 railroads that operate in the western part of the United States. It includes carriers that make up the Trans-Continental Freight Bureau as well as other carriers that operate west from Chicago. Quotation 61–D was made by the Executive Committee—Western Railroad Traffic Association; Quotation 263–C was made by the Trans-Continental Freight Bureau.

For many years, special transit points convenient to Government installations have been made available to defendant by means of section 22 quotations. Quotation 61–D and Quotation 263–C, in their present format, apparently were first offered to the Government in the mid–1950's. The transit points listed in Quotations 61–D and 263–C were not at locations where other shippers using the railroads would request storage in transit.

The section 22 quotations here involved include, with certain designated exceptions, most of the commodities that the Government would ship by railroad; the quotations were not designed specifically to cover automobile freight traffic. The primary purpose of the quotations was to provide storage-in-transit privileges. The through rates applicable to the Government shipments accorded SIT, pursuant to Quotations 61–D and 263–C, were the lowest applicable all-rail carload rates from the point of origin to the final destination "in effect by tariff or as provided in any applicable quotation on the date of" shipment from the initial point of origin. In the absence of a section 22 quotation with a special rate, these through rates were the tariff through rates that would be available to commercial shippers, with SIT at other transit points, for the same category of commodities.

Prior to 1960, the eastbound and westbound transcontinental commodity tariffs did not include transcontinental per-car through rates for automobile traffic. Most of the automobile freight traffic at that time had been diverted from the railroads to motor carriers. In the late 1950's, the railroads made an effort to recapture the

transcontinental automobile freight traffic, and, as part of this effort, the railroads developed and introduced new multilevel railroad cars specifically designed for automobile transport. Per-car rates for automobile freight initially were included in the tariffs in 1960. At that time, no limitations were placed on storage-in-transit privileges that would be available under the new rates.

Inasmuch as the 1960 tariff changes were an attempt by the carriers to attract automobile freight traffic then being carried by motor carriers, the vast bulk of the traffic sought to be obtained would originate in the automobile manufacturing locations. Most of the transcontinental automobile freight traffic sought to be obtained would move from Detroit or from other eastern manufacturing points to points on the West Coast. The quantity of automobile freight traffic from these sources would justify development of multilevel equipment. Government shipment of automobiles which were accorded SIT pursuant to the section 22 quotations, came from two sources: automobiles returned from overseas or imported through coastal ports in conjunction with other Government-owned commodities, and automobiles (principally trucks) purchased as new equipment from manufacturers. Prior to 1960, all of the Government's automobile traffic moved on flat cars.

In summary, the transcontinental commercial automobile traffic sought to be recaptured by the railroads normally would move on multilevel cars in westbound shipments. Most of the Government transcontinental automobile traffic, eastbound or westbound, normally would not require specialized equipment and could be conveniently moved on flat cars.

In 1963, the eastbound and westbound transcontinental freight tariffs were amended in the sections applicable to per-car rates for automobile freight traffic to add a restriction on storage-in-transit privileges then available to commercial shippers. There is no evidence that, in the period between 1960 and 1963, the carriers sought to deny to the Government's automobile freight traffic SIT provided in the section 22 quotations at the per-car through rates in the tariffs.

The restriction on SIT in the eastbound and westbound transcontinental freight tariffs was added in the form of a footnote. The text of the proposed footnote was sent to the TCFB members on May 20, 1963, with the stated reason that the amendment was "[t]o insure orderly movement of multilevel equipment." On June 10, 1963, a report on the proposal was circulated to the TCFB members which provided that the footnote would become effective in December 1963. Reasons for the adoption of the footnote included the statement that the tariff change "will avoid the wasteful use of multi-level cars and thereby increase the efficiency of their use," and that elimination of SIT would avoid the problems that arise "where there are no rail facilities for unloading double or triple deck cars." The TCFB documents show that a major reason for the addition to the tariff of the restriction on SIT was to assure efficient use of the multilevel equipment that had been developed to attract automobile traffic from commercial shippers.

Quotation 61–D was amended on March 26, 1963, to add an exception to item 1, traffic covered. The exception provided that the traffic covered would not include "shipments moving on bi-level or tri-level cars to transit points in Eastern or Western territories." The exception contained the formal definitions of eastern and western territories which, in general, were New England and the area east of Pittsburgh for the eastern territory and the area west of a line between Chicago and the Mississippi River for the western territory. In this definition, Avondale, Colorado, would be in the western territory and, accordingly, the exception to shipments on bi-level or tri-level cars would apply.

On April 10, 1963, in Quotation 61–D, the exception to item 1 again was amended to provide that the traffic covered would not include "shipments moving on bi-level or tri-level cars to or from the transit point." The effect of this amendment was to make

the exception apply to all transit points, including transit points in central territories. There was no additional effect on Avondale, Colorado.

In the period between 1963 and 1969, there is no evidence in the record that the carriers permitted the Government to have SIT privileges at Avondale, Colorado, or at West Yermo, California, at the per-car through rates. In the normal course, plaintiff would have collected from the Government on its automobile freight shipments the tariff rates that the railroad believed to be applicable to shipments accorded SIT.[1] There is no evidence that, in the period 1963 through 1969, the Government protested the railroad's charges or asserted a right to SIT at per-car through rates under Quotations 61–D or 263–C.

Interpretation of railroad tariffs and section 22 quotations involves questions of law; the judicial function does not differ in character from interpretation of other contractual instruments in dispute. The ordinary rules of contract interpretation apply; strained or unnatural constructions are to be avoided; all provisions are to be considered in determining the meaning to be ascribed to one provision; and preference is to be given to that interpretation that accords meaning to all provisions and does not render any part surplusage or in conflict.[2] It is axiomatic that the intent of the parties is controlling,[3] and such intent is to be gathered from the whole of the documents involved.[4] Disputed terms should be given meaning to effectuate the dominant purpose of the instruments, and not produce an improbable or absurd result. The tariffs and quotations involved in this case were drafted and published by agents of plaintiff and other carriers. Any ambiguity in the instruments, in accordance with standard rules of contract interpretation, must be construed against plaintiff.[5]

Both Quotation 61–D and Quotation 263–C had one overriding purpose. It was to provide the Government with special transit points that were convenient to Government installations. These special transit points were not available to commercial shippers or otherwise available to the Government under commercial tariffs. It was not the purpose of the quotations to give, and they do not purport to give, the Government any special transportation rate in addition to the special transit points.

The transit privileges provided by the quotations are defined in item 2 of Quotation 61–D and in item 3 of Quotation 263–C. Each declares that the privilege is to be "at the through all-rail rate specified" in other sections of the quotation. Each quotation specifies that the through rate shall be the applicable all-rail carload rate "in effect by tariff or as provided in any applicable quotation on the date of such shipment."[6]

---

1. In the normal course, subsequent to the performance of its transportation services, as the final and delivering carrier, plaintiff would present its bills for settlement and these bills routinely would have been paid in their face amount. Thereafter, in performance of the statutory audit required by 49 U.S.C. § 66, the General Accounting Office (since 1975 GSA) would disallow the parts of bills subject to challenge, and collect the resulting overcharges by deductions from other bills submitted by plaintiff.

2. *Southern Pac. Transp. Co. v. United States*, 454 F.2d 740, 745, 197 Ct.Cl. 143, 151 (1972), and cases there cited.

3. *Union Pac. R.R. v. United States*, 434 F.2d 1341, 1345, 193 Ct.Cl. 521, 529 (1970).

4. *Atchison, T. & S. Fe Ry v. United States*, 181 Ct.Cl. 315, 321 (1967); *W. G. Cornell Co. v. United States*, 376 F.2d 299, 179 Ct.Cl. 651 (1967).

5. *Union Pac. R.R. v. United States, supra* note 3, 434 F.2d at 1346, 193 Ct.Cl. at 530.

6. Item 6 of Quotation 61–D states in part:
    "(a) When reshipped from the transit point within twelve (12) months from the date of the inbound freight bill:
    "Each shipment made from its port of importation or origin on and after the effective date hereof shall be subject and entitled to the lowest applicable all-rail carload rate thereon, from such port to final destination, *in effect by tariff or as provided in any applicable Quotation* on the date of such shipment from port of importation or origin." (Emphasis supplied.)
    Item 7 of Quotation 263–C states in part:
    "(A) When reshipped from the transit point within twelve months from the date of inbound freight bill:

There are no other "applicable" section 22 quotations that would provide special through rates for automobile freight traffic accorded SIT privileges at Avondale, Colorado, or West Yermo, California. Quotations 61–D and 263–C provide special transit privileges but not special through-rate privileges. Determination of the through rates specified in the quotations, accordingly, requires application of the through rates provided by Tariffs 1–Q or 2–H. The through rate to the Government for shipments accorded SIT under the quotations would be the rates under the tariff that applied to a commercial shipper that was accorded "storage-in-transit privileges as published in tariffs lawfully on file with the Interstate Commerce Commission."

The following analysis applies to computation of the through rate for SIT accorded at Avondale, Colorado. After 1963, Quotation 61–D did not provide SIT for shipments on bi-level or tri-level cars; only automobile freight that moved on flat cars was eligible for SIT at Avondale, Colorado. All of the shipments in dispute that had SIT at Avondale, Colorado, moved on flat cars. The per-car rates for automobile freight shipped on flat cars provided in Tariff 2–H, item 4715, column A, are the rates available to commercial shippers and, in the absence of a special rate to the Government by quotation, to the Government as well. The tariff makes per-car rates for automobile freight loaded on flat cars "Subject to Note 3, except as noted."[7] Commercial shippers accorded SIT privileges "as published in tariffs lawfully on file" are not eligible for the per-car rates in column A for flat car shipments. Item 6 of Quotation 61–D specifies that the rate that applies to shipments accorded SIT under the quotation is the rate "in effect by tar-

iff." This rate to the Government would be the rate under the tariff that was available to a commercial shipper that was accorded SIT under the tariff. The tariff rate, in such a case, would not be the per-car rate listed in Tariff 2–H, item 4715, part 1, column A.

The following analysis applies to computation of the through rate for SIT accorded at West Yermo, California. Quotation 263–C accords SIT at West Yermo, California, for shipments on flat cars, bi-level cars, or tri-level cars; all of the automobile freight involved in the disputed westbound shipment moved on bi-level or tri-level cars. Quotation 263–C, in item 3, states that the through rate for shipments that were allowed the transit privilege would be "the through all rail rate specified in Item No. 7."

In the absence of any section 22 quotation that provides a special through rate, item 7 provides that each shipment shall be entitled to the all-rail carload rate "in effect by tariff." Tariff 1–Q, item 1845, makes the per-car rates set forth in part 7 for automobile freight loaded on bi-level or tri-level cars "Subject to Note 60." The per-car rates set forth in Tariff 1–Q for automobile freight shipped on bi-level or tri-level cars are the rates available to commercial shippers and, in the absence of special rates to the Government by quotation, to the Government as well. Commercial shippers accorded SIT privileges "as published in tariffs lawfully on file" are not eligible for the per-car rates set forth in part 7 of item 1845. The per-car rates for bi-level or tri-level cars provided in Tariff 1–Q, item 1845, were not the all-rail carload rates "in effect by tariff" for shipments that were accorded storage-in-transit privi-

---

"Each shipment made from its initial point of origin on and after the effective date hereof shall be subject and entitled to the all-rail carload rate applicable on the transited commodity from such point of origin to final destination *in effect by tariff or as provided in any applicable quotation* on the date of such shipment from initial point of origin." (Emphasis supplied.)

The emphasized clause also appears in other subsections relative to reshipment after 12 months or other movements.

7. In item 4715 of Tariff 2–H, exceptions to note 3 were designated by arabic 9 encircled (9) in column A of the tables. Rates so designated at the specified cities were not subject to the note 3 restriction. This exception does not apply to flat car shipments of automobile freight to the cities listed in Texas or in Colorado.

leges "as published in tariffs lawfully on file." There is no per-car rate under Tariff 1–Q that is available to commercial shippers that are accorded SIT in shipments on bi-level or tri-level cars. Accordingly, there is no per-car rate to apply to the Government shipments that were accorded SIT privileges under Quotation 263–C.

Differences in the structure and the terms of the tariffs and quotations may be attributed to variances in drafting techniques utilized by the different personnel on the railroad bureaus and associations involved. Tariffs 1–Q and 2–H and Quotation 263–C are products of the Trans-Continental Freight Bureau. Quotation 61–D is the product of the Western Railroad Traffic Association. The more generalized geographical interests of the association's larger membership would cause the Western Railroad Traffic Association to accord more emphasis to the primary reason for the addition of restrictions on SIT for automobile freight—more efficient use of multi-level equipment. The 1963 amendment to Quotation 61–D that eliminated SIT for shipments on bi-level or tri-level cars addressed itself specifically to this purpose. The concerns of the freight bureau, however, reflected the rate and traffic interests of its eight voting members. The westbound tariff (Tariff 1–Q) restricted SIT for shipments on bi-level or tri-level cars, which carried the bulk of the market sought to be recaptured. The eastbound tariff (Tariff 2–H) restricted SIT for shipments on flat cars as well as multilevel cars in order to maximize revenue from automobile freight as well as to assure efficient use of the new multilevel equipment. Neither tariff is ambiguous, however, and the intent of the railroad rate bureau in the application of notes 3 and 60 is clear.