## The MENOMINEE TRIBE OF INDIANS et al.

v.

## The UNITED STATES.

No. 134-67 (Basic).

United States Court of Claims.

Oct. 17, 1979.

---

Angelo A. Iadarola, Washington, D. C., atty. of record, for plaintiffs; Frances L. Horn, Jerry C. Straus, Robin A. Friedman, and Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Glen R. Goodsell, with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant; Richard L. Beal, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and DAVIS, NICHOLS, KUNZIG, BENNETT and SMITH, Judges.

OPINION

DAVIS, Judge:

This case arises out of the Menominee Termination Act of 1954, Pub.L. No. 399, ch. 303, 68 Stat. 250, *as amended*, 25 U.S.C. §§ 891–902 (1970), a different aspect of which was previously before the court in *Menominee Tribe of Indians v. United States*, 388 F.2d 998, 179 Ct.Cl. 496 (1967), *affirmed* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). Under the Treaty of Wolf River in 1854, 10 Stat. 1064, the Menominee Tribe received and occupied for over a century a reservation in Wisconsin. In 1953 Congress by concurrent resolution (H.Con.Res. 108, 67 Stat. B132) directed the Secretary of the Interior to recommend legislation for withdrawing federal supervision over certain American Indian tribes, including the Menominees. A year or so later, the Congress passed the Menominee Termination Act of 1954, amending it in 1956 (Pub.L. No. 715, ch. 601, Pub.L. No. 718, ch. 604, 70 Stat. 544, 549), 1958 (Pub.L. No. 85–488, 72 Stat. 290), and 1960 (Pub.L. No. 86–733, 74 Stat. 867). Actual termination came about on April 30, 1961.

As summarized by the Supreme Court, 391 U.S. at 408–10, 88 S.Ct. at 1708, the purpose of the Termination Act was by its terms " 'to provide for orderly termination of Federal supervision over the property and members' " of the tribe. Under the Act's provisions (as amended), the tribe was to formulate a plan for future control of tribal property and service functions theretofore conducted by the United States. On or before April 30, 1961, the Secretary was to transfer to a tribal corporation or to a trustee chosen by him all property real and personal held in trust for the tribe by the United States. The Act also provided for

closing of the membership roll of the tribe; this was done in December 1957.

"The Menominees submitted a plan, looking toward the creation of a county in Wisconsin out of the former reservation and the creation by the Indians of a Wisconsin corporation to hold other property of the tribe and its members. The Secretary of the Interior approved the plan with modifications; the Menominee Enterprises, Inc. [one of the plaintiffs herein] was incorporated; and numerous ancillary laws were passed by Wisconsin integrating the former reservation into its county system of government." 391 U.S. at 408–09, 88 S.Ct. at 1708 (footnotes omitted). The Act also provided that after the transfer by Interior of title to the property of the tribe, all federal supervision was to end in that "individual members of the tribe shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians," and "all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe." 25 U.S.C. § 899 (1970). The Act goes on to say that "the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." *Id.*[1]

Much dissatisfied with the termination and its results, the Menominee Tribe (together with various representatives of that entity and its members) brought this suit in April 1967, under 28 U.S.C. § 1491 and § 1505, for various items of damage said to have followed upon the Termination Act and the termination. The essential charge is that the passage and implementation of the Act was a breach of the trust owed by the United States to the Menominees, and in some instances a violation of the Just Compensation Clause of the Fifth Amendment.[2]

The trial judge and the parties agreed to present first to the court the general issue of whether the United States is liable to the plaintiffs for breach of trust on account of the enactment and putting into effect of the Termination Act. Accordingly, after a trial devoted to that subject (and others), Trial Judge Spector issued his opinion and findings on that question.[3] Without in any way separating the Congressional action in considering and enacting the Termination Act, or the mandatory provisions of that Act, from the actions of the Interior Department under the statute and other legislation, the trial judge ruled that a breach of trust had occurred (reserving for further determination the damages arising out of that breach). Detailing the reasons why he considered that termination was not in the best interests of the Menominees but was initiated by the United States for its own interests, and why he considered that the Menominees were pressured and pushed into termination without adequate assistance and against their own interests—with "disastrous effect upon the Indians' assets and way of life"—the trial judge concluded that this constituted "an abrogation of defendant's fiduciary obligations growing out of its treaty and trust relationship to plain-

1. We have held that the Termination Act did not abolish the tribe and that the Menominee Indians continue to constitute a tribe which is eligible to bring suit here under 28 U.S.C. § 1505. *Menominee Tribe of Indians v. United States, supra,* 388 F.2d at 1000–01, 179 Ct.Cl. at 500–01.

2. The original petition included claims bearing the following descriptions: Menominee Deed (Forest) Restrictions; Forest Management; Mill Mismanagement; Highway Rights of Way; Power Line Right of Way; Public Sewerage System; Soo-Line Right of Way (Railroad); Termination Expenses; and Mismanagement of Tribal Funds. Plaintiffs have since abandoned the claim entitled Soo-Line Right of Way and added one entitled Loss of Tax Exemption. Pursuant to request of counsel, an order was issued May 21, 1973, separating the claims into nine separate dockets as follows: Deed Restrictions No. 134–67A; Forest Mismanagement No. 134–67B; Mill Mismanagement No. 134–67C; Highway Rights of Way No. 134–67D; Termination Expenses No. 134–67E; Loss of Tax Exemption No. 134–67F; Power Line Rights of Way No. 134–67G; Public Sewerage System No. 134–67H; Mismanagement of Tribal Funds No. 134–67I (severed for later trial).

3. The opinion is denominated by the trial judge as "the basic opinion underlying a large and complex group of cases each involving a separate claim."

tiffs, and that defendant's acts and omissions constitute a breach of the fiduciary duty owed to plaintiffs." The general bases of this holding are revealed by the trial judge's ultimate findings of fact which we reproduce in the footnote.[4] It is clear that the primary ground of the trial judge's conclusions is the enactment of the Termination Act and its provisions.

■ The case is now before us on the Government's exceptions to the trial judge's opinion and findings in which it argues mainly that there was no breach of duty, imposed by treaty or statute, by the United States in terminating federal supervision of the Menominee Tribe. We do not consider that question because it is our view that, in 28 U.S.C. §§ 1491 and 1505, Congress has not consented to suit by Indians in this court on non-constitutional claims for breach of trust based directly on the passage and enactment by Congress of legislation it considers appropriate but which the claimant deems a violation of a fiduciary

obligation. In other words, we do not understand our general jurisdictional provisions as giving us authority to entertain a suit contending that a statute passed by Congress, though valid and constitutional, is nevertheless a breach of trust owed by the Federal Government to the Indians.[5]

### I.

It is important to underscore at the beginning that this case, as it now comes to us, does not involve at this stage any claim by the Indian plaintiffs for a Fifth Amendment taking (contrast *Sioux Nation of Indians v. United States*, 601 F.2d 1157, 220 Ct.Cl. —— (1979)),[6] or any argument that the Termination Act was constitutionally invalid in any respect. The entire claim is that the passage, enactment, and implementation of the Termination Act (as amended), pursuant to its terms, was a non-constitutional breach of the trust which the United States, as a governmental entity, owed to

---

**4.** 108. The Menominee Termination Act was initiated by the United States, in the interests of the United States. It was not in the best interests of the Menominees as a tribe nor as individual Indians that the federal trusteeship be terminated. Termination policy was initiated by the United States in order to "get out of the Indian business" and to reduce costs, specifically within the Bureau of Indian Affairs.

109. The Menominee Tribe and its members did not effectively consent to termination of federal supervision and trusteeship over the tribe, its members, and its assets.

110. Termination was not warranted under any of the four criteria established by Acting Commissioner of Indian Affairs Zimmerman. Defendant failed to apply the criteria which it enunciated. Adequate studies were not made and had they been made in advance, they would have demonstrated that the Menominee did not meet those criteria for termination.

111. Following passage of the Termination Act in 1954, defendant failed to adequately assist the Menominees to prepare for final termination which became effective in 1961.

112. During the period 1954–1961 it became apparent that the Menominees were not prepared for termination and that the tribe and its assets would suffer harmful consequences if a termination policy was implemented. There was, nevertheless, no reappraisal of the policy of termination.

113. The Menominees were not trained to assume the extensive responsibilities imposed upon them by involuntary termination. They

were not trained in self-government, nor to assume supervisory management or sub-management positions with respect to the Menominee Forest or sawmill operations.

114. If termination was to be imposed on the Menominee Tribe, it required a period of from one to two generations (20–40 years), of phased withdrawal from federal supervision, to effect the transition without serious damage to the tribe.

115. Failure of the defendant to prepare the tribe for termination, and the imposition of termination without the necessary preparation, constituted an abrogation of defendant's fiduciary obligations growing out of its treaty and trust relationship to the Menominee Tribe and its members. Defendant's acts and omissions constitute breach of a fiduciary duty owned to plaintiffs.

**5.** The trial judge assumed without discussion that there was jurisdiction over all Indian claims for breach of trust, of whatever character, and made absolutely no distinction in his opinion or findings between the actions of Congress setting policy and directing conduct and the conduct of executive officials contrary to Congressional policy and directives.

**6.** Certain of the individual claims (*see* note 2, *supra*) do present such claims of a constitutional taking.

the Menominees under various treaties and long-continued practice.[7]

In deciding whether (or to what extent) Congress has given us jurisdiction of such a suit, we assume *arguendo* and without in any way determining, first, that such a trust relationship existed with respect to the Menominees; second, that the trial judge correctly decided the underlying facts and circumstances on which he based his ultimate findings; and third, that the ultimate findings are correct. Since we conclude that the court has no jurisdiction of at least the bulk of this "basic" claim, we have no occasion to review most of the findings. As for the few findings which may have some bearing on the aspects of the separate claims which still survive, we think it better not to consider or adopt them, so that the separate claims can be evaluated wholly afresh and apart from the trial judge's basic opinion (and the related findings) which in our view entertained and upheld a general claim over which this court has at this time no jurisdiction.

## II.

We have twice recently upheld our jurisdiction over a non-constitutional breach of trust claim by Indians. *Mitchell v. United States,* 591 F.2d 1300, 219 Ct.Cl. ——, *cert. granted,* —— U.S. ——, 99 S.Ct. 2880, 61 L.Ed.2d 309 (1979); *Duncan v. United States,* 597 F.2d 1337, 220 Ct.Cl. —— (1979). But both cases involved solely claims that the Interior Department had acted improperly under Congressional legislation imposing trust duties on that agency which it was said to have violated. In neither instance was it claimed that the enactment of any statute was itself a breach of trust. In *Mitchell* the Indians accepted and relied on various statutes, primarily the General Allotment Act, 25 U.S.C. §§ 331 et seq. (1976), urging merely that the Interior Department had failed to follow the requirements of those Acts. Likewise, in *Duncan,* involving the termination of the Robinson Rancheria in California, the plaintiffs relied squarely on the Rancheria Act, Pub.L. No. 85–671, 72 Stat. 619 (1958), saying (as we held) that the Secretary of the Interior had not abided by the statutory requirements.[8]

This is the first time we have confronted the separate and distinct issue of whether 28 U.S.C. §§ 1491 and 1505 give us jurisdiction of a non-constitutional breach of trust claim for money—not because some federal official contravened a governing statute or treaty—but because Congress itself, in enacting a statute, violated (without trenching on the Constitution) a general trust obligation owed by the United States as a government to the Indians.

## III.

The problem is whether 28 U.S.C. §§ 1491[9] and 1505[10] authorize us to con-

---

**7.** There is no claim, and we do not think there could be, that the Termination Act created a contract between the Menominees and the United States which was breached by the later amendments or by the Interior Department in carrying out the termination. *See Klamath & Modoc Tribes v. United States,* 436 F.2d 1008, 1022, 193 Ct.Cl. 670, 697, *cert. denied,* 404 U.S. 950, 92 S.Ct. 271, 30 L.Ed.2d 267 (1971) (Klamath Termination Act did not create a contract).

**8.** All of the earlier Indian breach of trust cases decided by this court under our general jurisdictional provisions (*see Mitchell, supra,* 591 F.2d at 1303; *Duncan, supra,* 597 F.2d at 1345–46) also involved claims either that officials of the Government had acted improperly under controlling statutes or treaties, or that there had been a Fifth Amendment taking. Similarly, all the Supreme Court decisions cited by plaintiffs, or of which we are aware, involved the same type of claims.

**9.** 28 U.S.C. § 1491 provides in pertinent part:
"The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

**10.** 28 U.S.C. § 1505 provides:
"The Court of Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Claims if the claimant were not an Indian tribe, band or group."

sider that kind of monetary claim. Congress could, of course, grant such consent if it wished. It did so (at least in part) in section 2 of the Indian Claims Commission Act, Pub.L. No. 726, ch. 959, 60 Stat. 1050, 25 U.S.C. § 70a (1976), which authorized the Commission to hear (among other types) "claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." Under that broad rubric the Commission (and this court on appeal) considered contentions that treaties ratified by Congress or legislation passed by it amounted to less than fair and honorable dealings, or that Congress's failure to act fell into that same class. *See, e. g., Oneida Tribe of Indians of Wisconsin v. United States*, 165 Ct.Cl. 487, 496–97, 499–500, *cert. denied*, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964); *Seminole Nation of Oklahoma v. United States*, 492 F.2d 811, 203 Ct.Cl. 637 (1974); *United States v. Goshute Tribe*, 512 F.2d 1398, 1400–01, 206 Ct.Cl. 401, 407–08 (1975); *United States v. Oneida Nation of New York*, 576 F.2d 870, 217 Ct.Cl. —— (1978). In the two *Sioux Nation* cases, the entire court agreed that an award could be made under the "less-than-fair-and-honorable" provision for the acquisition by Congress of the Black Hills through an 1877 statute—the only disagreement was whether a constitutional taking had occurred. *See United States v. Sioux Nation*, 518 F.2d 1298, 207 Ct.Cl. 234, *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); *Sioux Nation v. United States*, 601 F.2d 1157, 220 Ct.Cl. —— (1979), including the dissent of Bennett, J.[11]

But neither section 1491 nor section 1505 contains any provisions comparable to the "fair and honorable dealings" clause or the clause countenancing revision of treaties, etc. for fraud, unconscionable consideration, etc. (note 11, *supra*). The predecessor of section 1505 was originally a part of the Indian Claims Commission Act of 1946 and

Congress obviously knew that that new jurisdictional provision for future litigation directly in this court was different from and narrower than the very broad jurisdictional provisions for the claims to be heard initially by the Commission.[12] *See Klamath and Modoc Tribes v. United States*, 174 Ct.Cl. 483, 486–90 (1966).

When we examine the words of sections 1491 and 1505 against the historical background of legislative consents-to-suit by Indians in this court, we cannot find that Congress has empowered us to hear and to determine non-constitutional claims that a fiduciary duty toward Indians has been breached by the passage of legislation by the Congress itself. We look first to the text of the jurisdictional statutes (*see* notes 9 and 10, *supra*).

*Section 1491:* At this time there is no claim before us founded on the Constitution. *See* Part I, *supra*. Accordingly, the grant of jurisdiction over claims founded on the Constitution is now irrelevant. Nor is the claim of breach of trust we are considering "founded" upon an "Act of Congress." The cause of action is plainly not "founded" upon the Termination Act in the sense that that legislation is invoked as the source of plaintiffs' rights; rather, the statute is pointed to as breaching plaintiffs' preexisting rights said to flow from prior treaties or from the general law of Indian relations. Neither is the claim we confront today "founded" on "any regulation of an executive department," nor could it be in view of the enactment of the Termination Act (which would, of course, displace any prior executive regulation). Perhaps the early treaties on which plaintiffs rely for their claim of a trust obligation could possibly be deemed an "express or implied contract with the United States" if bare language alone were to be taken into account. But the general history of consents-to-sue

---

11. To some extent nonconstitutional claims on account of Congressional action could also be brought before the Indian Claims Commission under clause (3) of section 2, 25 U.S.C. § 70a: "[C]laims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable con-

sideration, mutual or unilateral mistake, whether of law or of fact, or any other ground cognizable by a court of equity."

12. Section 1505 was first enacted as section 24 of the Indian Claims Commission Act, Pub.L. No. 726, ch. 959, 60 Stat. 1055.

in this court (which we evaluate in detail *infra*) counsels strongly against including within that category Indian treaty provisions subsequently modified or displaced by a valid Act of Congress such as the Termination Act. The same is true for the provision for jurisdiction over "liquidated or unliquidated damages in cases not sounding in tort," the least developed and least known of our kinds of jurisdiction. For interpretation of that little-invoked clause (as with the other parts of the Tucker Act), history counts more than the dictionary in discovering the Congressional purpose. *See United States v. King*, 395 U.S. 1, 5, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).

*Section 1505:* Everything we have said about the terms of section 1491 applies as well to section 1505, which substantially tracks section 1491 and has been construed to cover the full ground of the latter. *See Klamath and Modoc Tribes v. United States, supra*, 174 Ct.Cl. 483, 489–90 (1966); *Mitchell v. United States, supra*, 591 F.2d 1300, 1302 n.10, 219 Ct.Cl. ——.

This review of the statutory texts may show that, if we concentrated on the language alone, we could conceivably interpret portions of sections 1491 and 1505 [13] as supporting the jurisdiction plaintiffs urge (and which the trial judge assumed) for this nonconstitutional claim for breach of trust occasioned by Congress's passage of the Termination Act. But the language is neither unambiguous nor exact, and we are persuaded against that position by the historical treatment of consents to Indians to sue the sovereign in this court, as well as by the prevailing views as to the power of Congress over Indian relationships (where, as here, the Constitution is not involved).

There is, first of all, the accepted canon that consents to sue the United States are not to be found where expressed only equivocally. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). On the

precise issue now presented, we have nothing at all express in the statutes but only some general and ordinary words which can possibly be stretched to cover the claim, but need not necessarily be so understood. In contrast, as we have seen, Congress was much more wide-ranging, liberal, and explicit in the words it used (for Indian Claims Commission jurisdiction) in section 2 of the same Indian Claims Commission Act which created the forerunner of section 1505.

Second, it has also been established for at least seventy years that Congress has the unilateral and plenary power (to the extent that there is no violation of the Constitution, including the Just Compensation Clause) to abrogate or modify, by statute, a prior treaty with Indians. *See Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903); *Choate v. Trapp*, 224 U.S. 665, 670–71, 32 S.Ct. 565, 56 L.Ed. 941 (1912); *Shoshone Tribe v. United States*, 299 U.S. 476, 497, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *Delaware Tribal Business Committee v. Weeks*, 430 U.S. 73, 84, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 587–88, 594, 598, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians*, 27 Stan.L. Rev. 1213, 1223–27 (1975).

In the light of this principle, it is hard to believe—simply by using "treaties" in section 1505 or "an express or implied contract" in section 1491 or "any claim * * for liquidated or unliquidated damages in cases not sounding in tort" in the same provision—that Congress envisaged monetary suits in this court based on a claim that a valid, constitutional [14] *statute* abrogating, modifying, or "breaching" a prior Indian treaty was nevertheless a compensable breach of trust or fiduciary duty. The concept that a valid Act pertaining to Indians can be, in itself, a violation of fiduciary duty, which is vindicable as a legal claim, was not at all formed when the predecessors of section 1491 were passed,[15] and in

---

13. *I. e.*, "express or implied contract," "liquidated or unliquidated damages in cases not sounding in tort," "treaties."

14. Including the absence of any duty to pay just compensation.

15. *See* W. Cowen, P. Nichols, M. Bennett, *The United States Court of Claims—A History*, Part II ("Origin—Development—Jurisdiction, 1855–1978"), 216 Ct.Cl. 63–64, 69–70, 72, 73 (1978).

1946 when section 1505 first became law such a cause of action appears to have been deemed purely "moral" (and redressable only before the Indian Claims Commission under section 2, *supra,* or under a properly worded special jurisdictional act).[16] It is, of course, common ground that section 1505 blankets only legal, not purely moral, claims. *See Mitchell v. United States, supra,* 591 F.2d at 1303, 219 Ct.Cl. at ——; *Navajo Tribe v. United States,* 586 F.2d 192, 200–01, 218 Ct.Cl. —— (1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979); *Klamath and Modoc Tribes v. United States,* 174 Ct.Cl. 483, 487–90 (1966).

Third, in the days when Indians could sue in this court only under special jurisdictional statutes, there was a strong tradition that such a special act would not be construed as allowing the court (or the Supreme Court on appeal) to pass on the fairness or justice of an Act of Congress, or of a treaty ratified by Congress, unless the language of the jurisdictional statute compelled that result. For a court to pass upon the fairness, justice, good faith, or propriety of a valid Congressional act was considered unseemly, and an intrusion on the domain of the legislative department. *See United States v. Mille Lac Band,* 229 U.S. 498, 500, 33 S.Ct. 811, 57 L.Ed. 1299 (1913); *United States v. Choctaw Nation,* 179 U.S. 494, 532–35, 21 S.Ct. 149, 45 L.Ed. 291 (1900); *United States v. Old Settlers,* 148 U.S. 427, 466, 468, 469, 13 S.Ct. 650, 37 L.Ed. 509 (1893); *Sioux Tribe of Indians v. United States,* 97 Ct.Cl. 613, 663–65, 681–82, 684, 685 (1942), *cert. denied,* 318 U.S. 789, 63 S.Ct. 992, 87 L.Ed. 1155 (1943); *Chippewa Indians v. United States,* 88 Ct.Cl. 1, 45, *aff'd on other grounds,* 307 U.S. 1, 59 S.Ct. 687, 83 L.Ed. 1067 (1939); *see also Menominee Tribe of Indians v. United States,* 101 Ct.Cl. 10, 21 (1944).

When Congress came to enact Section 1505 in 1946, to control future Indian litigation in this court, it did not use any words, or reveal any aim, to show that it wished to go beyond this tradition (except where the Constitution was involved). By contrast, it did make a deliberate effort to extend as much as possible the jurisdiction of the Indian Claims Commission over past wrongs, legal and moral. *See Klamath and Modoc Tribes v. United States, supra,* 174 Ct.Cl. at 489.[17]

These considerations impel up to hold that sections 1491 and 1505, as now worded, do not authorize us to entertain the non-constitutional claim that the enactment of the Termination Act of 1954 was a breach of trust by Congress for which the plaintiffs can obtain monetary relief. We think that, for us to consider such a claim, Congress would have to be more definite and precise in granting us that type of jurisdiction. This is our reading of the general

---

**16.** The legislative history of the predecessor of section 1505 speaks only of wrongdoings by federal officials and does not mention a constitutional statute as being the possible source of a compensable claim. *See Mitchell v. United States, supra,* 591 F.2d at 1303–04, 219 Ct.Cl. at ——. There is a reference to the Indians being able to sue on "any controversy with the Federal Government that may arise in the future," but this was said in the context that the Indian would thereafter have "the same right as his white or black neighbor to secure a full and free hearing in the Court of Claims * * *." Since there are very few, if any, instances in which non-Indians can claim in this court that a fully valid statute violates their rights, we hardly think that the general reference to "any controversy with the Federal Government" covers the present claim.

**17.** *Klamath and Modoc Tribes* quotes at length from the Congressman Jackson, principal House sponsor of the Indian Claims Commission bill, who said:

"In order to make sure that we have included all possible claims within the jurisdiction of the Commission, we have gone over the various special Indian jurisdictional acts that Congress has passed in recent years and put together the various phrases that are used in these different acts. We might have condensed this language but we thought it best even at the risk of some duplication or overlapping to make sure that we had covered every sort of case which Congress has in recent years considered worthy of a hearing. It will be noted that some of the categories refer to purely legal claims, while others refer to claims based on equity and fair dealing * * *." [92 Cong.Rec. 5312–13 (1946)]

language of sections 1491 and 1505, in the light of the historical background of Indian rights and Indian litigation against the sovereign.

As shown by our opinions in *Mitchell* and *Duncan* (*see* Part II, *supra*), we think that breaches of trust resulting from the actions of officials of the Government in violation of a valid treaty or statute are quite different, and within our authority. For that type of breach of trust, we believe that Congress has already granted consent to sue.[18] But when the valid acts of Congress itself are assailed as unjust, unfair, in bad faith, or blind to the Indians' interest—in a case not raising a constitutional claim—we do not believe that Congress intended in sections 1491 or 1505 to repose that unusual authority, novel except for Indian Claims Commission cases, in this court.[19]

### IV.

■ In 1973 Congress enacted the Menominee Restoration Act, Pub.L. No. 93–197, 87 Stat. 770, 25 U.S.C. §§ 903–903f (1976), which repealed the Termination Act and generally restored the Menominee Tribe and reservation to trust status. Plaintiffs cite this statute as a legislative recognition that the Termination Act was in derogation of the United States' fiduciary responsibilities to the tribe. Whether or not this is so, the Restoration Act does not grant this court any jurisdiction it would not have if the Termination Act had been left unrepealed.

The legislative history of the restoration statute does contain substantial material reflecting adversely on the passage of the Termination Act (*see, e. g.,* S.Rep.No.93–604, 93rd Cong., 1st Sess. 3 (1973); H.Rep. No.93–572, 93rd Cong., 1st Sess. 3 (1973)), but there is nothing in the 1973 enactment remotely granting to or recognizing in the Menominees any monetary claim against the United States for the termination or its results, or extending this court's jurisdiction to cover such a claim. There is no such provision in the text of the statute, nor can any such inference be drawn. On the contrary, both committee reports explicitly disavow any implication of a monetary claim which some feared might arise from one of the provisions of the Restoration Act. S.Rep.No.93–604, *supra,* at 6; H.Rep.No.93–572, *supra,* at 4.[20]

### V.

■ The jurisdictional barrier against our appraisal of Congress's action in enacting the Termination Act covers (a) any evaluation of Congressional motives or the interests Congress was pursuing; (b) any alleged failure of Congress to prepare the Menominees for termination, to make a full and fair disclosure to them of all pertinent facts, to allow further time before termination was effected, to give greater assistance to the Indians in the termination process, to reconsider the policy of termination, to adopt modified legislation, or to determine before final amendment of the Act whether

18. In *Mitchell* and *Duncan,* (a) an Act of Congress gave or confirmed a trust relationship between the Federal Government and the Indians, (b) executive officials were alleged to have acted contrary to this Congressional legislation and thus to have breached the trust Congress established or recognized, and (c) the Indian plaintiffs claimed that compensable damages flowed from these breaches of trust by the officials. On those premises we held that we had jurisdiction under sections 1491 and 1505, and that this interpretation accorded with the revealed Congressional purpose, as well as the prior decisions of the Supreme Court and this court. The same is true of *Coast Indian Community v. United States,* 550 F.2d 639, 652–54, 213 Ct.Cl. 129, 152–56 (1977) (in which there was no challenge to jurisdiction).

19. When Congress provided for transfer of undecided Indian Claims Commission cases to this court, it made express that this court's regular jurisdiction under section 1505 was not broadened in any way. Act of March 30, 1972, Pub.L. No. 92–265, § 23, 86 Stat. 114, 115, 25 U.S.C. § 70v (1976).

20. The reports said: "Some concern was expressed that section 3(b) reinstating the tribe and its members to all rights and privileges under any Federal treaty, statute or otherwise which might have been lost or diminished by the termination act, might be interpreted to be retroactive to 1954, thus giving rise to claims against the United States. The Committee wishes to make clear that the subsection has no retroactive effect and is not intended to be the basis for any claim against the United States."

the Tribe and its members were ready to assume management and control of their property and affairs; and (c) any alleged duress or pressure by Congress or its members on the Menominees to obtain their consent to termination. It follows that very little is left of the "basic" claim now before us since that relates almost entirely to the passage and enactment of the Termination Act and its amendments. Plaintiffs assure us repeatedly that we should not now consider any of the specific claims (see note 2, *supra* ), including the constitutional contentions that plaintiffs are entitled to just compensation because Congress imposed a post-termination sustained yield requirement on the Menominee forest or because the Interior Department included a 30-year restraint on alienation in the deed of the forest land to Menominee Enterprises, Inc.[21] See Plaintiffs' Brief In Opposition, pp. 28, 31, 48, 62–63, 64, 66. We take plaintiffs at their word, but add that these specific claims will, of course, have to be decided within the limits of our jurisdiction.

■ There is some suggestion, moreover, that, even if there is no jurisdiction over the claim for breach of trust through the passage of the Termination Act, the defendant is liable because the Interior Department failed in its own obligations toward the Indians with respect to the termination process. Most aspects of this contention fall with our holding of lack of jurisdiction over Congress's conduct in passing the Act. That ruling cannot be evaded by saying that, although we cannot examine the fairness or propriety of the legislative process, we can hold the defendant liable because the Interior Department did not itself undertake to try to stop Congress or to advise or persuade it differently or to do more than Congress required of it in order to prepare the Menominees for the termination Congress had ordered. Interior's role cannot thus be separated from that of Congress. Unless the Department violated the

Constitution or some outstanding directive of Congress, the United States cannot be held liable for Interior's affirmative actions or passive omissions with respect to the passage and implementation of the Termination Act.

There is a small residue of argument that Interior did violate the Termination Act.[22] Plaintiffs attempt to enlarge the Department's obligations under the statute by pointing to the opening section which declares that the general purpose is "to provide for *orderly* termination of Federal supervision" (emphasis added). 25 U.S.C. § 891 (1970). It is hard to see in that routine descriptive phrase any directive to the Secretary above and beyond the specific duties placed upon him by the subsequent sections of the legislation (or the Constitution, or other legislation). Neither the rest of the terms of the Act nor its legislative history suggest that the Secretary was to have a wider or more protective role under the Act than the specific provisions gave him. Plaintiffs themselves characterize the Act as part of an effort "to get out of the Indian business"—and in somewhat of a hurry.

The only specific provisions of the Termination Act now invoked by plaintiffs are the parts of 25 U.S.C. § 896 relating to the preparation and adoption of a plan for the future control of the tribal property and service functions. Section 896 first calls upon the Indians to formulate and submit such a plan to the Secretary for his approval, and also authorizes the Secretary "to provide such reasonable assistance as may be requested by officials of the tribe in the formulation of the plan." The Secretary is to accept the tribal plan if he finds that it "will treat with reasonable equity all members" and "conforms to applicable Federal and State law." If the tribe failed to submit a plan within the specified time, the Secretary had to prepare and submit a plan to the Tribe.[23] (The provisions for failure

---

**21.** They also tell us that three of the claims (forest mismanagement; sawmill mismanagement; and power line right-of-way) are wholly unrelated to the termination.

**22.** We consider that we have jurisdiction of this type of claim. *Mitchell v. United States,*

*supra; Duncan v. United States, supra.* The discussion which follows centers on whether plaintiffs have stated a proper claim.

**23.** Section 896 (section 7 of the original Termination Act, as amended) provides as follows:

of the Menominees to submit a plan are immaterial here since they did submit a plan in time.)

■ The only possible violation by Interior of Section 896, which placed the initial burden of preparing and formulating the plan on the tribe, would be in the Secretary's improper approval of the plan and any failure to provide "reasonable assistance *as may be requested by officials of the tribe* in the formulation of the plan" (emphasis added). There appears to be no argument that the Secretary's approval of the plan failed to comply with the statutory standard, but we leave that issue open.[24] As for the provision for reasonable assistance, we do not understand that any request by the Tribe for reasonable assistance (of the kind authorized by the statute) was turned down or left unsatisfied. However, we leave that question open, also, if plain-

tiffs wish to pursue it further. In view of the precise wording of the Secretary's authority as to assistance, we cannot agree that Interior was required to proffer advice or assistance not sought by the Menominees (who were represented by skilled attorneys) and perhaps not wanted.

Because plaintiffs have rolled both Congressional action (and inaction) and departmental action (and inaction) into one inseparable claim of breach of trust, we are not sure of the extent to which plaintiffs are complaining that Interior violated, in connection with the termination, statutes other than the Termination Act. For instance, plaintiffs' brief refers to loss of the Menominees' hospital shortly after termination in 1961 because the Bureau of Indian Affairs had failed, in remodeling the hospital with the Menominees' own funds, to take account of Wisconsin state structural re-

The tribe shall as soon as possible and in no event later than February 1, 1959, formulate and submit to the Secretary a plan for the future control of the tribal property and service functions now conducted by or under the supervision of the United States, including but not limited to services in the fields of health, education, welfare, credit, roads, and law and order, and for all other matters involved in the withdrawal of Federal supervision. The Secretary is authorized to provide such reasonable assistance as may be requested by officials of the tribe in the formulation of the plan heretofore referred to, including necessary consultations with representatives of Federal departments and agencies, officials of the State of Wisconsin and political subdivisions thereof, and members of the tribe. The Secretary shall accept such tribal plan as the basis for the conveyance of the tribal property if he finds that it will treat with reasonable equity all members on the final roll of the tribe prepared pursuant to section 893 of this title, and that it conforms to applicable Federal and State law. In the event the tribe fails to submit a plan approvable under the terms of sections 891 to 902 of this title by February 1, 1959, the Secretary shall cause such a plan to be prepared and submitted to the tribe within three months thereafter. The tribe shall thereafter have three months within which to accept the plan of the Secretary or to submit to the Secretary tribal proposals for modification. If the Menominee Tribe and the Secretary cannot agree upon a plan within the aforementioned six-month period, or if they agree upon a plan within such period and the tribal corpo-

ration and voting trust contemplated by the plan are not established prior to March 1, 1961, the Secretary shall transfer the tribal property to a trustee of his choice for the management or disposition for the benefit of the Menominee Tribe. The responsibility of the United States to furnish all such supervision and services to the tribe and to the members thereof, because of their status as Indians, shall cease on April 30, 1961, or on such earlier date as may be agreed upon by the tribe and the Secretary. The plan shall contain provision for protection of the forest on a sustained yield basis and for the protection of the water, soil, fish and wildlife. To the extent necessary, the plan shall provide for such terms of transfer pursuant to section 897 of this title, by trust or otherwise, as shall insure the continued fulfillment of the plan. The Secretary, after approving the plan, shall cause the plan to be published in the Federal Register. The sustained yield management requirement contained in sections 891 to 902 of this title, and the possible selection of a trustee in the event of a tribal planning default, shall not be construed by any court to impose a financial liability on the United States.

24. We do not agree with plaintiffs' apparent contention that the Termination Act gave the Secretary general authority to disapprove the plan if he thought the Menominees unprepared for termination, or that he could delay termination on that ground. Section 896 establishes a specific time-table envisaging speedy completion of the process.

quirements, although the Bureau was well aware that termination was coming and that such state demands would have to be met. If this contention is factually correct, it might prove to be a violation of other legislation giving the Bureau control over the Indians' funds. There is also a claim that the Bureau drastically reduced its reservation staff after passage of the Termination Act but before actual termination. This charge might be sustained, if it turned out that this alleged drastic reduction was not a proportionate cut due to a general reduction-in-force in all Bureau functions or services, but a unique, premature withdrawal by the Bureau (on its own) of services available to the Menominees simply because the Bureau knew they were going to be terminated some time later.[25]

█ We leave open issues of this type because we are not clear as to their alleged foundation. The controlling standard for further proceedings will be that the following types of claim may still be litigated: (a) claims said to arise under the Constitution; (b) claims that the Interior Department violated the Termination Act in the respects left open by the preceding discussion in this opinion; (c) claims that the Interior Department violated other statutes in its dealings with the Menominees; and (d) the specific claims set forth in note 2, *supra*, insofar as they do not rest on Congress's (or the Interior Department's) alleged breach of fiduciary duty through the passage and enactment of the Termination Act.[26]

## CONCLUSION OF LAW

The trial judge's opinion and findings are vacated and the case is returned to him for further proceedings in conformity with the foregoing opinion. The petition in No. 134–67 is dismissed to the extent indicated in the foregoing opinion.

**25.** To the extent this claim rests on a failure or refusal of Congress to appropriate the funds plaintiffs deem sufficient, we think that the claim is beyond this court's jurisdiction for the reasons already given. *Cf. Klamath and Modoc Tribes v. United States*, 436 F.2d 1008, 1021–22, 193 Ct.Cl. 670, 696–97, *cert. denied*, 404 U.S. 950, 92 S.Ct. 271, 30 L.Ed.2d 267 (1971); *Oneida Tribe of Indians of Wisconsin v.*

*United States*, 165 Ct.Cl. 487, 499–500, *cert. denied*, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964) (Indian Claims Commission case).

**26.** Because of our disposition, it is unnecessary to reach defendant's point as to the statute of limitations. That issue will also remain open for further litigation if defendant wishes to press it.