Casimer LeBEAU and Vernon Ashley, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

UNITED STATES of America, Defendant,

and

The Sisseton–Wahpeton Sioux Tribe; Spirit Lake Tribe; and the Sisseton–Wahpeton Sioux Council of the Assiniboine & Sioux Tribes, Intervenors–Defendants.

No. Civ. 99–4106.

United States District Court,
D. South Dakota,
Southern Division.

Sept. 25, 2001.

John M. Grossenburg, Winner, SD, Charles Rick Johnson, Johnson, Eklund, Nicholson, Peterson & Fox, Gregory, SD, for plaintiff.

Jan L. Holmgren, United States Attorney's Office, Sioux Falls, SD, for defendant.

James E. McMahon, Boyce, Murphy, McDowell & Greenfield, Sioux Falls, SD, Bertram E. Hirsch, Great Neck, NY, for interested party, Sisseton–Wahpeton Sioux Tribe, Spirit Lake Tribe, and Sisseton–Wahpeton Sioux Counsel of the Assiniboine and Sioux Tribes.

## MEMORANDUM OPINON AND ORDER

PIERSOL, Chief Judge.

The plaintiffs, Casimir LeBeau and Vernon Ashley, filed a motion to amend the complaint, Doc. 51, and a second motion for judgment on the pleadings, Doc. 60. The defendant, United States, filed a motion for summary judgment, Doc. 66. The intervenors-defendants, the Sisseton–Wahpeton Sioux Tribe, the Spirit Lake Tribe and the Sisseton–Wahpeton Sioux Council of the Assiniboine and Sioux Tribes ("the Tribes") filed a motion for summary judgment, Doc. 62. A hearing on the pending motions was held on May 18, 2001, with the plaintiffs appearing by their counsel, J.M Grossenburg, the United States appearing by its counsel, Assistant United States Attorney Jan L. Holmgren, and with the Tribes appearing by their counsel, Bertram E. Hirsch. Having taken the motions under advisement, the Court now grants plaintiffs' motion to amend the complaint and denies the second motion for judgment on the pleadings. The United States' motion for summary judgment is granted in part and denied in part. The Tribes' motion for summary judgment is granted in part and denied in part.

## I. FACTUAL BACKGROUND

This action was filed by the plaintiffs to challenge the constitutionality of a recently enacted law which has the effect of diminishing, by at least 28.3995%, the funds appropriated by Congress in 1968, plus accumulated interest, and allocated in 1972 for the benefit of plaintiffs and others similarly situated to satisfy a final judgment entered by the Indian Claims Commission[1] relating to the United States' breach of two treaties[2] involving approximately 27 million acres of land ceded to the United States by the Sisseton and Wahpeton Sioux Tribes in the 19th century. *See* Pub.L. No. 105–387, 112 Stat. 3471 (codified at 25 U.S.C. § 1300d–21 *et seq.* (2001)). Pursuant to the Act of June 19, 1968 Congress appropriated nearly $6 million to satisfy the judgment entered by the Indian Claims Commission (hereinafter referred to as "the Judgment Fund"). *See* Pub.L. No. 90–352, 82 Stat. 239. In the Act of October 25, 1972 ("the 1972 Act"), Congress allocated 25.0225% of the nearly $6 million Judgment Fund for distribution to Sisseton and Wahpeton Mississippi Sioux Tribe lineal descendants (hereinafter referred to as "lineal descendants") who were not members of the tribes listed in the 1972 Act but could trace lineal ancestry to tribal members listed on rolls acceptable to the Secretary of the Interior ("Secretary"). *See* Pub.L. No. 92–555, 86 Stat. 1168 (codified at 25 U.S.C. § 1300d, *et seq.* (1983) (amended 1998)). The number of lineal descendants who were not members of the three successor tribes was unknown at the time the 1972 Act was enacted. *See* S.Rep. No. 92–144, at 7 (1971). Plaintiffs are lineal descendants who have been determined to be eligible to share in the distribution pursuant to the 1972 Act, but who, to this day, have not received any funds pursuant to the 1972 Act. In October 1998, the lineal descendants' share was estimated to be worth approximately $15.2 million. *See* S.Rep. No. 105–379, at 3 (1998).

In an action filed in the Montana district court in 1987, the Tribes challenged the validity of the portion of the 1972 Act which allocates 25.0225% of the Judgment Fund to the lineal descendants. *See Sisseton–Wahpeton Sioux Tribe v. United States,* 686 F.Supp. 831 (D.Mont.1988) ("*Sisseton I*") (subsequent history omitted). The Montana District Court held that the plaintiff Tribes' claims were barred by the statute of limitations, finding that the Tribes had waited nearly fifteen years to challenge Congress' allocation of the Judgment Fund. *See id.* at 834, 837–38. The Ninth Circuit Court of Appeals agreed the Tribes' claims regarding the lineal descendants' share of the Judgment Fund were time-barred. *See Sisseton–Wahpeton Sioux Tribe v. United States,* 895 F.2d 588, 597 (9th Cir.), *cert. denied,* 498 U.S. 824, 111 S.Ct. 75, 112 L.Ed.2d 48 (1990) ("*Sisseton II*"). On remand for consideration of the possibility of amending the complaint, the Montana District Court granted summary judgment to the United States and the Ninth Circuit again affirmed the denial of relief to the Tribes. *See Sisseton–Wahpeton Sioux Tribe v. United States,* 90 F.3d 351, 356 (9th Cir.), *cert. denied,* 519 U.S. 1011, 117 S.Ct. 516, 136 L.Ed.2d 405 (1996) ("*Sisseton III*"). During the pendency of the

---

**1.** *Sisseton and Wahpeton Bands or Tribes, et al. v. United States,* 18 Ind.Cl.Comm 526–1 (1967).

**2.** The Sisseton and Wahpeton Sioux Tribes ceded approximately two million acres of land to the United States by the Treaty of Prairie du Chien of July 15, 1830 (7 Stat. 328) and approximately 25 million acres of land by the Treaty of Traverse des Sioux of July 23, 1851 (10 Stat. 949). *See Sisseton–Wahpeton Sioux Tribe v. United States,* 686 F.Supp. 831, 833 (D.Mont.1988) (subsequent history omitted).

Tribes' claims in the federal court system, the lineal descendants did not receive any of the funds allocated to them by the 1972 Act. In 1994, individuals claiming to be lineal descendants eligible to share in the Judgment Fund brought an action contending they were not given notice of the Judgment Fund and seeking to share in the 25 .0225% allocated to the lineal descendants pursuant to the 1972 Act. *See Loudner v. United States,* 108 F.3d 896 (8th Cir.1997). The Eighth Circuit ruled that the plaintiffs' claims in *Loudner* were not time-barred, *id.* at 903–04, and the Secretary is currently in the process of determining how many additional lineal descendants will share in the Judgment Fund allocated to the lineal descendants, *see Loudner v. United States,* CIV 94–4294 (D.S.D.) (on remand).

In 1998, Congress enacted the Mississippi Sioux Tribes Judgment Fund Distribution Act of 1998 ("the 1998 Act"), which is the subject of the present action. *See* 25 U.S.C. § 1300d–21 *et seq.* (2001). Pursuant to the 1998 Act, the Tribes will receive at least 28.3995% of the lineal descendants' share of the Judgment Fund allocated to the lineal descendants in the 1972 Act if a final judgment is not entered in favor of one or more lineal descendants in this action. *See* 25 U.S.C. §§ 1300d–23(a)(1), 1300d–26, and 1300d–27 (2001). If a final judgment is entered in favor of one or more lineal descendants in this action, the Tribes will not receive a distribution under the 1998 Act, and the lineal descendants will receive the share of the Judgment Fund allocated to them in the 1972 Act. *See* 25 U.S.C. § 1300d–27(e) (2001).

The United States moves for summary judgment, contending that: 1) the Court does not have jurisdiction over plaintiffs' claim that the United States breached a trust duty owed to the plaintiffs as a result of Congress' enactment of the 1998 Act; 2) the United States did not breach a trust duty owed to plaintiffs by failing to distribute plaintiffs' shares of the Judgment Fund; and 3) the enactment of the 1998 Act did not constitute a taking of plaintiffs' property without payment of just compensation under the Fifth Amendment. In support of the above contentions, the United States argues that no common law trust duties exist and any trust duties owed to plaintiffs would arise from either the 1972 Act or the 1998 Act. The only alleged breach of trust, the United States contends, is for failure to distribute the money to the lineal descendants within a reasonable time and manner. Asserting that a six-year statute of limitations applies to plaintiffs' breach-of-trust claim, the United States contends that any delay in distribution of the Judgment Fund between 1972 and 1987 is time-barred. Moreover, the United States asserts that the Secretary has been carrying out the duty to prepare the rolls required by 25 U.S.C. § 1300d–3(b) (1983) (amended 1998), and that any delay in the preparation of the rolls has been caused by persistent litigation involving the Judgment Fund spanning several years. The United States contends the plaintiffs lack a private property interest in the Judgment Fund, which is required to prevail on their takings' claim, because the lineal descendants never obtained a vested right in the fund. When Congress enacted the 1998 Act, the United States argues, it had the power to revise the original allocation of the Judgment Fund, as set forth in the 1972 Act, because the money remained tribal property and had not yet been distributed to the lineal descendants. The United States claims that Congress was providing for the disposition of tribal property, rather than individual property, when it enacted the 1972 Act. The United States argues that plaintiffs will not possess a vested property right in the Judgment Fund until distribution occurs, or at the earliest, when the Secretary

prepares the roll of eligible lineal descendants as required by 25 U.S.C. § 1300d–3(b) (2001). Even if plaintiffs possessed a vested property interest in the Judgment Fund, the United States contends plaintiffs' taking claim fails because none of the Judgment Fund was taken for "public use" under the Fifth Amendment.

The Tribes advance many of the same arguments made by the United States and incorporate its arguments in support of the Tribes' motion for summary judgment. Citing Congress' plenary power over Indian affairs, the Tribes contend the 1998 Act is valid because Congress possessed the power, prior to distribution, to reallocate a portion of the Judgment Fund from the lineal descendants to the Tribes. The Tribes contend plaintiffs lack a constitutionally protected property interest in the Judgment Fund because: 1) plaintiffs never had the right to possess, use or dispose of the Judgment Fund; 2) plaintiffs could not acquire an individual property interest in the Judgment Fund, which was awarded to compensate the Tribes for the taking of tribal lands; 3) no portion of the Judgment Fund was held in the Treasury to the credit of individual lineal descendants; 4) no individual lineal descendant has been approved to share in the Judgment Fund because the Secretary has not prepared the roll of eligible lineal descendants; 5) plaintiffs cannot identify a specific amount due to themselves; 6) an expectancy of a future property interest is not a present estate protected by the Fifth Amendment; 7) the eligibility letters plaintiffs received from the Secretary in 1979 did not contain any vesting language; and 8) a property right is not effective until all administrative actions required by statute are officially complete. Echoing the United States' argument, the Tribes contend the Judgment Fund was not taken for a "public use" because the United States never acquired an interest in the fund.

In resisting the summary judgment motions and in support of their motion for judgment on the pleadings, plaintiffs contend they possessed a private property interest protected by the Fifth Amendment when the 1998 Act was enacted. Following enactment of the 1972 Act, plaintiffs contend 25.0225% of the Judgment Fund allocated to the lineal descendants was no longer tribal property, subject to Congress' plenary authority over Indian affairs. See 25 U.S.C. § 1300d–4(c) (1983) (amended 1998). Plaintiffs claim "payment" of the Judgment Fund occurred when Congress appropriated the money and deposited it into the Treasury, creating a constitutionally protected property interest on behalf of the lineal descendants. Contrary to the United States' and the Tribes' arguments, plaintiffs contend the 1972 Act contains vesting language as to the lineal descendants' share of the Judgment Fund. At the very least, plaintiffs argue, the lineal descendants obtained a vested right in the Judgment Fund when the Secretary prepared the roll of eligible lineal descendants in 1987. Plaintiffs assert this action is brought on behalf of the class of lineal descendants, rather than solely for their individual benefit. Regarding their breach-of-trust claim, plaintiffs contend Congress gave the lineal descendants a specific property right by creating a trust fund for lineal descendants when it allocated funds to them in 1972. Plaintiffs claim the United States breached its fiduciary obligations by (1) failing to pay plaintiffs the amount of money awarded to them under the 1972 Act within a reasonable time and manner; and (2) enacting the 1998 Act, giving the Tribes approximately 28% of the lineal descendants' share of the Judgment Fund.

## II. DECISION

Summary judgment is appropriate if the moving party establishes that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, this Court views the evidence in a light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'" *Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir .1992) (quoting Fed.R.Civ.P. 56(e)).

Plaintiffs move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). "Judgment on the pleadings is appropriate only where the moving party has clearly established that no material issue of fact remains and the moving party is entitled to judgment as a matter of law." *Potthoff v. Morin*, 245 F.3d 710, 715 (8th Cir.2001). All facts pleaded by the non-moving party are accepted as true and all reasonable inferences from the pleadings are drawn in favor of the non-moving party. *See United States v. Any and all Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir.2000), *cert. denied*, 531 U.S. 1071, 121 S.Ct. 761, 148 L.Ed.2d 663 (2001).

Plaintiffs claim in their briefs on the pending motions that they are seeking to represent a class of lineal descendants rather than solely representing the interests of the named plaintiffs in this action. Plaintiffs, however, have not made a motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure and the Court has not ruled that this action can be maintained as a class action.

## A. Fifth Amendment Claim

■ Plaintiffs contend the 1998 Act violates their rights under the Fifth Amendment. The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." The Supreme Court explained that "[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Congressional acts are presumed to be constitutional. *See id.; Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981); *Flemming v. Nestor*, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

■ The Eighth Circuit recognized that "vested property rights of individual Indians are 'secured and enforced to the same extent and in the same way' as the equivalent rights of other citizens." *Irving v. Clark*, 758 F.2d 1260, 1262 (8th Cir.1985) (quoting *Choate v. Trapp*, 224 U.S. 665, 677, 32 S.Ct. 565, 56 L.Ed. 941 (1912)). Congress may, however, "alter and condition rights that have not yet vested in individual Indians." *Irving*, 758 F.2d at 1262 (citing *Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976); *United States v. Jim*, 409 U.S. 80, 93 S.Ct. 261, 34 L.Ed.2d 282 (1972) (per curiam)).

■ Property interests protected by the Fifth Amendment "are not created by the Constitution, but are instead defined by 'existing rules or understandings that stem from an independent source ...'" *Education Assistance Corp. v. Cavazos*, 902 F.2d 617, 627 (8th Cir.), *cert. denied*, 498 U.A. 896 (1990) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)). The

independent source may be state law or federal law "which defines a person's relation to a particular thing." *Cavazos,* 902 F.2d at 627 (citing *Flemming,* 363 U.S. at 608–11, 80 S.Ct. 1367). In this case, federal law defines plaintiffs' relation to the Judgment Fund:

**(a) Basis of apportionment**

After deducting the amount authorized in section 1300d of this title, the funds derived from the judgment awarded in Indian Claims Commission docket numbered 142 and the one-half remaining from the amount awarded in docket numbered 359, plus accrued interest, shall be apportioned on the basis of reservation residence and other residence shown on the 1909 McLaughlin annuity roll, as follows:

| Tribe or group | Percentage |
|---|---|
| Devils Lake Sioux of North Dakota | 21.6892 |
| Sisseton–Wahpeton Sioux of South Dakota | 42.9730 |
| Assiniboine and Sioux Tribe of the Fort Peck Reservation, Montana | 10.3153 |
| All other Sisseton and Wahpeton Sioux | 25.0225 |

**(b) Deposit in United States Treasury; per capita shares; advances, deposits, expenditures, investments or reinvestments for approved purposes; programming proposals**

The shares of the Devils Lake Sioux Tribe of North Dakota, the Sisseton and Wahpeton Sioux Tribe of South Dakota, and the Assiniboine and Sioux Tribe of the Fort Peck Indian Reservation, Montana, as apportioned in accordance with subsection (a) of this section, shall be placed on deposit in the United States Treasury to the credit of the respective groups. Seventy per centum of such funds shall be distributed per capita to their tribal members: *Provided,* That none of t he funds may be paid per capita to any person whose name does not appear on the rolls prepared pursuant to section 1300d–3(a) of this title. The remainder of such funds may be advanced, deposited, expended, invested, or reinvested for any purpose designated by the respective tribal governing bodies and approved by the Secretary of the Interior . . . .

**(c) Per capita distribution to enrollees**

The funds allocated to all other Sisseton and Wahpeton Sioux, as provided in subsection (a) of this section, shall be distributed per capita to the persons enrolled on the roll prepared by the Secretary pursuant to section 1300d–3(b) of this title.

25 U.S.C. § 1300d–4 (1983) (amended 1998). Thus, 25.0225% of the Judgment Fund was to be distributed per capita to the lineal descendants.

■ Congress imposed a one-year statute of limitations for the lineal descendants to file an action challenging the constitutionality or validity of the 1998 Act. *See* 25 U.S.C. § 1300d–27(d) (2001). Plaintiffs argue that this provision shows Congress recognized that the 1998 Act may be unconstitutional. A similar argument was advanced by the plaintiffs in *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 654, n. 6, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976). The Supreme Court rejected the plaintiffs' argument, stating " . . . Congress merely recognized that a plausible argument might be made on behalf of the allottees and desired its merit to be judicially determined." *Id.* The same rationale applies in the present case.

■ Plaintiffs argue that their share of the Judgment Fund was individual, rather than tribal, property because 25 U.S.C. § 1300d–4(c) (1983) (amended 1998) allocated 25.0225% of the Judgment Fund to them individually rather than to any tribal entity. A similar argument was made by individual Indians in *Delaware Tribal Business Committee v. Weeks,* 430 U.S. 73, 85, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977) and was rejected by the Supreme Court. The plaintiffs in *Weeks* were individual Indians excluded from a congressional act provid-

ing for distribution of funds to certain Indians pursuant to an award by the Indian Claims Commission to redress the United States' breach of an 1854 treaty. *See id.* at 75, 97 S.Ct. 911; Pub.L. No. 92–456, 86 Stat. 762 (codified at 25 U.S.C. §§ 1291–97). The challenged act provided that ten per cent of the award was to be set aside for two tribal bodies and the remaining 90 per cent was to be distributed per capita to certain individual Indians. *See* 25 U.S.C. § 1294. Despite the appropriation of funds to be distributed to individual Indians, the Supreme Court found that "Public Law 92–456 distributes tribal rather than individually owned property, for the funds were appropriated to pay an award redressing the breach of a treaty with a tribal entity." *Weeks,* 430 U.S. at 85, 97 S.Ct. 911. The Supreme Court recognized that "[a]s tribal property, the appropriated funds were subject to the exercise by Congress of its traditional broad authority over the management and distribution of lands and property held by recognized tribes, an authority 'drawn both explicitly and implicitly from the Constitution itself.'" *Id.* (quoting *Morton v. Mancari,* 417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). Moreover, the Supreme Court explained that Congress retains the power to revise its original allocation of judgment funds before distribution of the funds is made. *See Weeks,* 430 U.S. at 90, 97 S.Ct. 911 (citing *United States v. Jim,* 409 U.S. 80, 82–83, 93 S.Ct. 261, 34 L.Ed.2d 282 (1972)).

Similar to the funds involved in *Weeks,* the Judgment Fund at issue in this action was appropriated to pay an Indian Claims Commission award redressing the United States' breach of treaties with tribal entities. *See Sisseton II,* 895 F.2d at 590; *Sisseton and Wahpeton Bands or Tribes v. United States,* 18 Ind.Cl.Comm. 526–1 (1967). In both *Weeks* and the present case, Congress enacted a distribution plan that included per capita payments to cer-

tain individual Indians. *See* 25 U.S.C. § 1294; 25 U.S.C. § 1300d–4 (1983) (amended 1998). Despite the allocation of funds to individual Indians in *Weeks,* the Supreme Court held that the appropriated funds remained "tribal rather than individually owned property." 430 U.S. at 85, 97 S.Ct. 911. One distinction between the present case and *Weeks,* is that the plaintiffs here are individual Indians who were included in the distribution plan and the plaintiffs in *Weeks* were individual Indians who were excluded from the distribution plan. This distinction does not change the character of the property from tribal to individual property in the present case, but it does require the Court to consider whether plaintiffs have a vested property interest in the Judgment Fund.

The allocation language in the act challenged in *Weeks* differs from the allocation language to the lineal descendants in the 1972 Act. *Compare* 25 U.S.C. § 1294, *with* 25 U.S.C. § 1300d–4(c) (1983) (amended 1998). The funds at issue in *Weeks* were allocated to the tribe and 90 per cent of those funds were directed to be distributed per capita to each person on the Secretary's roll. *See* 25 U.S.C. § 1294. The lineal descendants' share of the Judgment Fund in the present case was not allocated to the Tribes for subsequent per capita distribution to the lineal descendants. *See* 25 U.S.C. § 1300d–4(c) (1983) (amended 1998). Rather, Congress allocated the funds directly to the lineal descendants and provided that those funds were to be distributed per capita to the lineal descendants on the roll prepared by the Secretary. *See id.* Congress directed that the funds at issue in *Weeks* "shall be placed to the credit of the tribe in the United States Treasury." 25 U.S.C. § 1294. Likewise, the Tribes' share of the Judgment Fund was required to be "placed on deposit in the United States Treasury to the credit of the respective groups." 25 U.S.C.

§ 1300d–4(b) (1983) (amended 1998). Conversely, Congress did not direct that the lineal descendants' share be placed to the credit of the lineal descendants in the United States Treasury. *See* 25 U.S.C. § 1300d–4(c) (1983) (amended 1998). The absence of a credit in the United States Treasury for the lineal descendants appears to provide Congress with more power to alter the allocation plan for the Judgment Fund than it possessed over the funds at issue in *Weeks,* making it less likely that the lineal descendants possessed a vested property interest under the 1972 Act.

The Tribes and the United States cite the Supreme Court's decision in *Hollowbreast,* 425 U.S. at 649, 96 S.Ct. 1793 to support their argument that plaintiffs did not have a vested property interest in the Judgment Fund. The issue in *Hollowbreast* was whether individual allottees of surface lands possessed vested rights in mineral deposits underlying those lands. *See id.* at 650, 96 S.Ct. 1793. The Supreme Court held that a 1926 congressional act did not grant the allottees vested rights in the mineral deposits. *See id.* Individual tribal members were granted allotments of tracts of land by the 1926 Act, but the rights to the timber, coal or other minerals, including oil, gas, and other natural deposits on those lands were reserved for the benefit of the tribe. *See id.* The 1926 Act further provided that " 'at the expiration of fifty years from the date of the approval of this Act the coal or other minerals, including oil, gas, and other natural deposits, of said allotments shall become the property of the respective allottees or their heirs.' " *Id.* (quoting Northern Cheyenne Allotment Act of June 3, 1926, 44 Stat. 690, 691). In the 1960's the value of coal reserves under the allotted lands increased considerably. *See id.* at 652, 96 S.Ct. 1793. In response to the increase in the value of coal and other considerations, Congress terminated the

grant to allottees of the mineral deposits and reserved the mineral rights " 'in perpetuity for the benefit of the Tribe.' " *Id.* (quoting Act of July 24, 1968, Pub.L. 90–424, 82 Stat. 424). To avoid liability for damages based upon a potential claim that the 1968 Act violated the allottees' rights under the Just Compensation Clause of the Fifth Amendment, Congress conditioned the termination of the allottees' interest in the mineral deposits upon a judicial determination that the 1926 Act did not grant allottees vested rights to the mineral deposits. *See id.* at 653, 96 S.Ct. 1793.

In *Hollowbreast,* the Supreme Court observed that it "has consistently recognized the wideranging congressional power to alter allotment plans until those plans are executed." *Id.* at 655–56, 96 S.Ct. 1793. "The extensiveness of this congressional authority, as well as 'Congress' unique obligation toward the Indians,' underlies the judicially fashioned canon of construction that these [allotment] statutes are to be read to reserve Congress' powers in the absence of a clear expression by Congress to the contrary." *Id.* at 656, 96 S.Ct. 1793 (citations omitted). Because the 1926 Act was consistent with both the allottees' interpretation that the 1926 Act granted allottees a vested future interest and with the tribe's interpretation that it granted only an expectancy, the Supreme Court looked to the 1926 Act's legislative history to determine Congress' intent. *See id.* at 654, 96 S.Ct. 1793. The legislative history of the 1926 Act demonstrated that the tribe desired to give individual tribal members agricultural and grazing lands, but reserve all mineral rights for the tribe. *See id.* at 657, 96 S.Ct. 1793. The provision granting mineral rights to allottees after 50 years was not explained in the legislative history of the 1926 Act. *See id.* After examining the legislative history, the Supreme Court concluded it was not Con-

gress' intent to grant individual allottees vested future interests in the mineral deposits underlying the allotted lands. *See id.* at 658–60, 96 S.Ct. 1793. Thus, the individual allottees did not possess a vested property interest in the mineral deposits and the 1968 Act did not violate the Just Compensation Clause of the Fifth Amendment. *See id.*

Unlike the legislative history of the 1926 Act challenged in *Hollowbreast*, the legislative history of the 1972 Act reveals Congress' intention to include in the distribution the lineal descendants of the aboriginal bands who did not become members of the three successor tribes. *See* S.Rep. No. 92–144, at 2–3; H.Rep. No. 92–1369, at 3–4 (1972). The Senate Committee on Interior and Insular Affairs report on the 1972 Act provides, in relevant part:

### PURPOSE

The purpose of S. 1462, introduced by Senator McGovern, for himself and Senator Burdick, is to authorize the distribution to Sisseton and Wahpeton Tribes of Sioux Indians their portion of a judgment against the United States recovered by the Mississippi Sioux Indians. The money has been appropriated and the net amount available is $6,154,020.79.

### NEED

The judgment, although appropriated, may not be used until the purpose has been authorized by Congress.

Successors to the combined Sisseton–Wahpeton (known as the Upper Council Sioux) are:

The Sisseton–Wahpeton Sioux Tribe of South Dakota (Lake Traverse Reservation).

The Devils Lake Sioux Tribe of North Dakota (Devils Lake Reservation).

The Sisseton–Wahpeton element within the Assinaboine and Sioux Tribe of Montana (Fort Peck Reservation).

While it is clear that these successor tribes exist and are representative of the aggrieved aboriginal bands, historical evidence confirms that there are additional descendents (sic) who are not enrolled with these successor tribes, but are entitled to share in the proceeds of the award.

The wide dispersion of the descendants (sic) of the aboriginal Sisseton–Wahpeton Sioux Tribes resulted from their participation in the Mississippi Sioux uprising against white settlers in Minnesota in August 1862, and which was brought under control by the military in 1863. After the uprising, the major portion of the Sisseton–Wahpeton bands of the Mississippi Sioux fled west and north, with some moving into Canada where many continue to reside.

A demonstrated result of the 1862 uprising was the forced and widespread dispersal of the aboriginal bands. Some descendents (sic) are living on the three successor reservations and others, and some descendents (sic) are scattered over a wide area. The bill therefore provides a method for all persons of Sisseton–Wahpeton Sioux blood to share in the award.

The bill provides for a basic apportionment of the judgement funds among the claimant groups on the basis of the 1909 McLaughlin Annuity Roll.

The percentage breakdown, as provided in section 5, is as follows:

| | |
|---|---|
| Devils Lake Sioux of North Dakota | 21.6892 |
| Sisseton–Wahpeton Sioux of South Dakota | 42.9730 |
| Assiniboine and Sioux Tribe of Fort Peck Reservation, Montana (meaning the Sisseton–Wahpeton element) | 10.3153 |
| All other Sisseton–Wahpeton Sioux | 25.0225 |

These percentages derive from the names and addresses found on the 1909 roll; 963 persons residing at Devils

Lake, 1,903 at Lake Traverse, 458 at Fort Peck, and 1,111 elsewhere, many on other reservations.

The bill authorizes the successor groups to utilize 70 per cent of their share of the funds for per capita payments to duly enrolled members and 30 per cent for programs to benefit the membership residing on their respective reservations and approved by the Secretary of the Interior. Others shall receive their proportionate share of the funds on proof of lineal descendancy with the aboriginal band. All of the concerned Indian groups endorse this method of apportionment and distribution of the judgment funds.

The Committee concurs with the provision of the bill that non-citizens shall not be enrolled. This is in reference to the Canadian Mississippi Sioux, and the proscription is supported by the successor tribes and the Department of the Interior.

S.Rep. No. 92–144, at 2–3. The House Committee on Interior and Insular Affairs submitted a similar report, which is set out in the margin.[3] While the 1972 Act's legislative history evidences Congress' intent to include the lineal descendants in the distribution of the Judgment Fund, it does not relinquish Congress' power to alter the allocation of the Judgment Fund.

In support of their argument that plaintiffs do not possess a protected property interest in the Judgment Fund, the Tribes and the United States also cite the Supreme Court's decision in *United States v. Jim*, 409 U.S. 80, 93 S.Ct. 261, 34 L.Ed.2d 282 (1972). In 1933, Congress added lands to the Navajo Reservation in Utah and provided that 37½ percent of royalties from oil and gas leases were to be paid to the State of Utah to be expended "in the tuition of Indian children in white schools and/or in the building or maintenance of roads across the lands ... or for the benefit of the Indians residing [in the Aneth Extension]." *Id.* at 80–81, 93 S.Ct. 261. Administrative problems developed in implementing the 1933 Act. *See id.* at 81–82, 93 S.Ct. 261. In response to these prob-

---

**3.** The committee report provides in relevant part:

EXPLANATION

The judgments were in favor of aboriginal bands that do not exist today. However, five modern day tribes are partial successors to the aboriginal bands. They are the Santee Sioux Tribe of Nebraska, the Flandreau Santee Sioux Tribe of South Dakota, the Sisseton Wahpeton Tribe of South Dakota, the Devils Lake Tribe of North Dakota, and the Siou[x] Tribe on the Fort Peck Reservation. These tribes should share in the judgments, but inasmuch as numerous descendants of the aboriginal bands are not numbers of these five tribes, the descendants also should share.

H.R. 6070 provides that the five successor tribes will prepare current membership rolls, and that descendancy rolls will be prepared for the others. These rolls will be used as the basis for a per capita distribution of a part of the judgments among the Indians.

Before any per capita distribution can be made, however, the money must be divided among the various tribal entities, and the group represented by the descendancy rolls. In the case of the Lower Sioux (Mdewakanton–Wahpakoota) the division will be on the basis of the relative numbers of Indians enrolled in the two successor tribes and the numbers of Indians enrolled on the descendancy rolls. In the case of the Upper Sioux (Sisseton–Wahpeton) the division will be made on the basis of the relative numbers of Indians residing in 1909 on the three reservations now occupied by the three successor tribes, and the number of descendants not so enrolled.

The five successor tribes will distribute per capita a portion of their share of the judgments. The Lower Sioux will distribute 80% and the Upper Sioux will distribute 70%. The balance will be programed for Reservation purposes. All Indians enrolled on the descendancy rolls will receive a 100% per capita. H.Rep. No. 92–1369, at 3–4 (1972).

lems, Congress enacted a statute in 1968 that substantially expanded the pool of beneficiaries for whom the State was to expend the royalties. *See id.* The individual Indians who received the benefit of the royalties under the 1933 Act brought a class action alleging the 1968 Act was an unconstitutional taking of property without just compensation. *See id.* The Supreme Court concluded the mineral lease royalties were tribal property. *See id.* at 82, 93 S.Ct. 261. Despite the 1933 Act's establishment of a distribution scheme that benefitted the individual plaintiffs more than other Indians on the Navajo Reservation, the Supreme Court held that "it was well within the power of Congress to alter [the] distributional scheme [in the 1933 Act]." *Id.* at 82, 93 S.Ct. 261. Finding that the 1933 Act did not confer a "property" interest, in the Fifth Amendment sense, upon the residents of the Aneth Extension, the Supreme Court held that the 1968 Act did not violate those residents' rights under the Fifth Amendment. *See id.* at 83, 93 S.Ct. 261. The 1998 Act in the present case diminishes the plaintiffs' interests in the Judgment Fund in much the same way the 1968 Act diminished the plaintiffs' interests in *Jim.*

In support of its conclusion that Congress had the power to alter the distributional scheme in *Jim,* the Supreme Court cited its decision in *Gritts v. Fisher,* 224 U.S. 640, 32 S.Ct. 580, 56 L.Ed. 928 (1912). *See Jim,* 409 U.S. at 82–83, 93 S.Ct. 261. Congress established an allotment and distributional scheme in 1902 relating to the Cherokee tribe's lands and funds, which precluded any children born after September 1, 1902 from sharing in the allotments and distribution of tribal property. *See Gritts,* 224 U.S. at 641, 643–44, 32 S.Ct. 580. Before the allotments and distributions under the act of 1902 were complete, Congress expanded the pool of Indians who were to benefit from land allotments and distribution of tribal property, to in-

clude any children born between September 1, 1902 and March 4, 1906. *See id.* at 646–47, 32 S.Ct. 580. Three tribal members adversely affected by this expansion, on behalf of themselves and others similarly situated, claimed that their due process rights were violated because the act of 1902 vested in them an "absolute right to receive all lands of the tribe not reserved or allotted thereunder, and all funds of the tribe not used in the payment of tribal debts." *Id.* at 646–47, 32 S.Ct. 580. Despite the express intent of Congress in the act of 1902 that the plaintiffs alone should receive allotments and participate in the distribution of excess lands and funds of the tribe, that express intention "did not confer upon them any vested right such as would disable Congress from thereafter making provision for admitting newly-born members of the tribe to the allotment and distribution." *Id.* at 648, 32 S.Ct. 580. Plaintiffs' argument failed because:

> [I]t treats the act of 1902 as a contract, when it is only an act of Congress, and can have no greater effect. It was but an exertion of the administrative control of the government over the tribal property of tribal Indians, and was subject to change by Congress at any time before it was carried into effect and while the tribal relations continued.

*Id.* (quotation marks and citations omitted). Although *Gritts* involved a due process challenge to a congressional act, its discussion of the vesting of property interests is instructive in the present case. Similar to *Gritts,* the 1972 Act did not create contractual rights and did not expressly preclude Congress from changing the allocation of the Judgment Fund prior to distribution.

In further support of their argument that plaintiffs do not possess a vested interest in the Judgment Fund, the Tribes point out that the plaintiffs will not be able

to identify the exact amount they will each receive under the 1972 Act until the Secretary prepares the roll of eligible lineal descendants under 25 U.S.C. § 1300d–3(b) (2001). *See Seldovia Native Ass'n. Inc. v. United States,* 144 F.3d 769 (Fed.Cir. 1998). *Seldovia* involved a takings claim by a native Alaskan village corporation relating to land allocations under the Alaska Native Claims Settlement Act ("ANCSA"), Pub.L. No. 92–203, 85 Stat. 668 (1971) (codified as amended at 43 U.S.C. §§ 1601–1629f). *See Seldovia,* 144 F.3d at 771–72. Each village corporation was allowed to select land they desired to possess based upon the size of its native population, but the ANCSA did not directly convey any specific land to the corporations. *See id.* at 772. The ANCSA did not convey land or money to individual Alaskans. *See id.* After the village corporations made their selections, the Secretary of the Interior and other offices responsible for issuing the patents needed time to survey the lands, verify that the selections were valid and resolve conflicting claims among the village corporations. *See id.* at 773. The process of allocating the land under the ANCSA created significant problems and the ANCSA had to be amended. *See id.* at 773–74. As a result of the amendments, some of the lands originally selected by the Seldovia village corporation were no longer available. *See id.* at 774. Seldovia then brought an action contending the initial act of selection gave it compensable property rights in the selected lands and that the amendments to the ANCSA constituted a taking of those lands in violation of the Fifth Amendment. *See id.*

The Federal Circuit found that Seldovia's initial land selections under the ANCSA were insufficient to convey compensable property rights to Seldovia "because selections by the village corporations lack fixity, i.e., selection does not sufficiently identify specific parcels in which rights are to be transferred." *Id.* at 781. None of the village corporations were able to identify with certainty any specific parcel of land it stood to receive until the Department of the Interior surveyed the land, confirmed the lack of pre-existing rights to the selected land and resolved competing claims to specific parcels of land. *See id.* Following selection, but before conveyance of the selected land, Seldovia did not possess "the right to lease or convey the land selected, the right to exclude others from entering the land, or the right to control the disposition of any resources on the land." *Id.* at 782. "Thus, Seldovia did not enjoy any of the rights usually associated with a compensable interest in property, such as 'the right to posses, use and dispose of' property, or the rights to alienate or to exclude others." *Id.* (citations omitted). The Federal Circuit concluded that following the land selections, "Seldovia had an expectation of receiving a certain amount of acreage, but it had no vested right to a specific parcel of land." *Id.* The text of the ANCSA and amendments thereto demonstrated that Congress did not intend to convey vested property rights in specific parcels of land based solely upon village corporations' selections. *See id.* at 7782–83.

Similar to the plaintiffs in *Seldovia,* plaintiffs here do not enjoy any of the rights normally associated with a compensable property interest. Plaintiffs cannot identify the amount of their individual property interests until the Secretary completes the roll required by 25 U.S.C. § 1300d–3(b) (2001). As noted above, this is not a class action where plaintiffs represent the entire class of lineal descendants. Plaintiffs obviously do not have the right to possess, use and dispose of their share of the Judgment Fund.

The above cases demonstrate that the statutory language and the legislative his-

tory of the 1972 Act must be evaluated to determine whether Congress intended to grant plaintiffs a vested property interest in the Judgment Fund. It is not clear from the statute itself whether Congress granted plaintiffs a vested interest in their allocated share of the Judgment Fund. *See* 25 U.S.C. § 1300d–4 (1983) (amended 1998). Therefore, pursuant to *Hollowbreast,* the 1972 Act's legislative history must be evaluated to determine whether Congress intended to grant a vested interest to plaintiffs. 425 U.S. at 654, 96 S.Ct. 1793. The legislative history of the 1972 Act quoted above shows that Congress intended, in 1972, to include the lineal descendants in the distribution of the Judgment Fund. *See* S.Rep. No. 92–144, at 2–3; H.Rep. No. 92–1369, at 3–4. But the legislative history does not establish that plaintiffs obtained a *vested* property right under the 1972 Act. Neither the legislative history of the 1972 Act nor the allocation language in the statute demonstrate that Congress intended to relinquish its "traditional broad authority over the management and distribution of lands and property held by recognized tribes." *Weeks,* 430 U.S. at 85, 97 S.Ct. 911; *see* 25 U.S.C. § 1300d–4 (1983) (amended 1998). Despite the legislative history of the 1972 Act showing that Congress intended to include the lineal descendants in the distribution of the Judgment Fund, the lineal descendants did not obtain *vested* property rights in the Judgment Fund because Congress retained the power to alter the allocation plan until the funds were distributed. *See Weeks,* 430 U.S. at 90, 97 S.Ct. 911 (recognizing that Congress retains the power to revise its original allocation of judgment funds before the funds are distributed); *Hollowbreast,* 425 U.S. at 655–56, 96 S.Ct. 1793 (recognizing Congress' power to "alter allotment plans until those plans are executed," in the absence of a "clear expression by Congress to the contrary."); *Jim,* 409 U.S. at 82, 93 S.Ct. 261 (upholding Congress' alteration of a distribution scheme involving tribal property); *Gritts,* 224 U.S. at 648, 32 S.Ct. 580 (holding that despite Congress' express intent that plaintiffs alone should receive distributions, that express intention "did not confer upon them any vested right" preventing Congress from altering the plan). The lineal descendants' share was not distributed when Congress enacted the 1998 Act. Therefore, Congress retained the power to alter the allocation plan in the 1972 Act and the enactment of the 1998 Act did not effect a taking of plaintiffs' property.

The Tribes seek to defend against the plaintiffs' claims by challenging the 1972 Act as a taking of their property in violation of the Fifth Amendment. The Tribes' arguments are barred by the statute of limitations or have otherwise been found to be without merit. *See Sisseton I,* 686 F.Supp. at 837–38 (dismissing Tribes' action challenging the 1972 Act as barred by the six-year statute of limitations applicable to all civil actions against the United States); *Sisseton II,* 895 F.2d at 597 (rejecting the Tribes' constitutional challenges to the 1972 Act with one exception); *Sisseton III,* 90 F.3d at 356 (rejecting the remaining exception remanded in *Sisseton II* ).

■ Plaintiffs contend that the claims raised by the Tribes in their motion for summary judgment regarding the constitutionality of Congress' allocation of funds to the lineal descendants in the 1972 Act are barred by the doctrine of res judicata. The Court agrees that the Tribes' claims are barred by res judicata.

■ "Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). Res judicata will bar a claim when: "(1) the first suit resulted in a final judgment on the merits; (2) the

first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action." *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998). "Furthermore, the party against whom res judicata is asserted must have had a full and fair opportunity to litigate the matter in the proceeding that is to be given preclusive effect." *In re Anderberg–Lund Printing Co.*, 109 F.3d 1343, 1346 (8th Cir.1997). It is clear from the above discussion regarding the prior lawsuits pursued by the Tribes that elements one, two and four are satisfied. The remaining element requires that plaintiffs be in privity with a party to the prior lawsuits because plaintiffs were not parties to the prior actions. "There are three generally recognized categories of nonparties who will be considered in privity with a party to the prior action and who will be bound by a prior adjudication: (1) a nonparty who controls the original action; (2) a successor-in-interest to a prior party; and (3) a nonparty whose interests were adequately represented by a party to the original action." *Tyus v. Schoemehl*, 93 F.3d 449, 454 (8th Cir.1996), *cert. denied*, 520 U.S. 1166, 117 S.Ct. 1427, 137 L.Ed.2d 536 (1997). The third category applies in this case. In the prior actions, the United States defended the constitutionality of the 1972 Act that allocated a portion of the Judgment Fund to the plaintiffs and other lineal descendants. *See Sisseton I*, 686 F.Supp. at 831; *Sisseton II*, 895 F.2d at 591–92; *Sisseton III*, 90 F.3d at 351. The

United States adequately represented the plaintiffs' interests in the prior actions. Thus, plaintiffs were in privity with the United States and are bound by the prior actions.[4] The Tribes are likewise bound by the prior actions under the doctrine of res judicata. *See Costner*, 153 F.3d at 673 (elements of res judicata).

### B. Breach–of–Trust Claims

Plaintiffs contend the United States breached its fiduciary obligations by (1) failing to pay plaintiffs the amount of money allocated to them under the 1972 Act within a reasonable time and manner; and (2) enacting the 1998 Act, giving the Tribes approximately 28 per cent of the lineal descendants' share of the Judgment Fund. The United States contends: (1) any claim for delay in distribution between 1972 and 1987 is barred by the six-year statute of limitations applicable to all civil actions against the United States, *see* 28 U.S.C. § 2401(a) (1994); (2) the delay in distribution between 1987 and the present time was due to persistent litigation involving the 1972 Act; and (3) the Court lacks jurisdiction to consider a breach-of-trust claim based on Congress' enactment of a constitutionally valid statute. Plaintiffs' breach-of-trust claim for enacting the 1998 Act involves issues separate from their breach-of-trust claim for delay and they will be addressed separately below.

### 1. Enactment of 1998 Act

 Citing a Court of Claims's[5] decision, the United States contends that the

---

4. Plaintiffs are, of course, advocating that they are bound by the prior actions because those actions were resolved in favor of the United States. Asserting res judicata in this context is similar to the offensive use of collateral estoppel allowed by the Supreme Court in *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329–33, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Trial courts have broad discretion to determine when offensive use of

collateral estoppel will be allowed. *See id.* None of the circumstances that might justify reluctance to allow the offensive use of collateral estoppel are present in this case. *See id.*

5. The Court of Claims is now known as the United States Court of Federal Claims. *See* 28 U.S.C. § 171 (1993); Pub.L. No. 102–572, 106 Stat. 4506.

Court lacks jurisdiction over plaintiffs' breach-of-trust claim for enactment of the 1998 Act. *See Menominee Tribe v. United States,* 221 Ct.Cl. 506, 607 F.2d 1335, 1344 (1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980) (distinguishing between an action for a breach of trust based solely on the enactment of a valid statute and actions for breaches of trust resulting from the actions of government officials in violation of a valid statute). This argument is premised on the ground that the 1998 Act is constitutional, because the Court of Claims carefully distinguished constitutional challenges to congressional acts from non-constitutional breach-of-trust claims based on enactment of congressional acts. *See Menominee,* 607 F.2d at 1339–40, 1343–44. Given that the 1998 Act is constitutional, as discussed above, plaintiffs' breach-of-trust claim relating to enactment of the 1998 Act is indistinguishable from the characterization of plaintiff tribe's claim in *Menominee.* Although the Court is not bound by the decision in *Menominee,* 607 F.2d at 1343, it is instructive regarding the Court's jurisdiction in the present action.

The issue in *Menominee* was "whether 28 U.S.C. §§ 1491 and 1505 give [the Court of Claims] jurisdiction of a non-constitutional breach-of-trust claim for money—not because some federal official contravened a governing statute or treaty—but because Congress itself, in enacting a statute, violated (without trenching on the Constitution) a general trust obligation owed by the United States as a government to the Indians." 607 F.2d at 1340. The two potential sources of jurisdiction referenced by the court were the Tucker Act, 28 U.S.C. § 1491 [6], and the act granting the Court of Claims jurisdiction over certain types of Indian claims, 28 U.S.C. § 1505.[7] Plaintiffs assert the jurisdictional basis for the breach-of-trust claims in the present action is the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2) [8] (1993). (*See* Motion to Amend Complaint, Doc. 51.) The "Little" Tucker Act does not expand the types of claims allowed by the Tucker Act. Rather, it grants jurisdiction to federal district courts for the same types of claims allowed by the Tucker Act that do not exceed $10,000. *See United States v. Mitchell,* 463 U.S. 206, 212, n. 10, 103 S.Ct.

6. The Tucker Act provides, in relevant part:
 The United States Court of Federal Claims shall have jurisdiction upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
 28 U.S.C. § 1491(a)(1) (1994).

7. The Court of Claims' (now the United States Court of Federal Claims) jurisdiction over Indian claims is defined by 28 U.S.C. § 1505:
 The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska whenever such claim is one arising under the Constitution,

laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group.
28 U.S.C. § 1505 (1994).

8. The "Little" Tucker Act provides in relevant part:
 (a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:
 . . .
 (2) Any other civil action or claim against the United States, not exceeding $ 10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
 28 U.S.C. § 1346(a)(2) (1993).

2961, 77 L.Ed.2d 580 (1983) (recognizing the distinction between the two statutes). The Supreme Court held that "by giving the Court of Claims jurisdiction over specified types of claims against the United States, the Tucker Act constitutes a waiver of sovereign immunity with respect to those claims." *Id.* at 212, 103 S.Ct. 2961 (footnote omitted). The Supreme Court further recognized that:

> [T]he Tucker Act does not create any substantive right enforceable against the United States for money damages. A substantive right must be found in some other source of law, such as the Constitution, or any Act of Congress, or any regulation of an executive department. Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States, and the claimant must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.

*Id.* at 216–17, 103 S.Ct. 2961 (citations and quotation marks omitted).

In *Menominee,* the Court of Claims held that neither the Tucker Act nor the act granting it jurisdiction over Indian claims authorized it to "entertain the non-constitutional claim that the enactment of the Termination Act of 1954 was a breach of trust by Congress for which the plaintiffs can obtain monetary relief." 607 F.2d at 1343. The plaintiff tribe in *Menominee* was unable to identify a source of substantive law to sustain its unconstitutional breach-of-trust claim. The only potential source of substantive law asserted by plaintiffs here is the provision in the 1998 Act that grants this Court jurisdiction "over any action brought to contest the constitutionality or validity under law of the distributions authorized under [the 1998] Act." 25 U.S.C § 1300d–27(b)(1)

(2001). Rather than allowing plaintiffs to obtain monetary relief if the 1998 Act was found to be unconstitutional or otherwise invalid, Congress specified the remedy available to lineal descendants if they prevailed in an action challenging the 1998 Act. *See* 25 U.S .C. § 1300d–27(e)(1) (2001). The remedy authorized by Congress in the event of a successful challenge to the 1998 Act is to void the distribution to the Tribes authorized by the 1998 Act, resulting in the lineal descendants receiving their share of the Judgment Fund, plus interest, as provided in the 1972 Act. *See id.* Clearly, this statute cannot "fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *Mitchell,* 463 U.S. at 216–17, 103 S.Ct. 2961.

Plaintiffs have failed to identify a source of substantive law that could be interpreted as mandating compensation by the United States for their claim that enactment of the 1998 Act itself was a breach of trust. Based upon the Court of Claims' rationale in *Menominee,* 607 F.2d at 1338–44, the Court concludes that it lacks jurisdiction, under 28 U.S.C. § 1346(a)(2), to hear plaintiffs' claim that enactment of the 1998 Act itself was a breach of trust.

*2. Delay in Distributing Funds*

As with the breach-of-trust claim for enactment of the 1998 Act, the asserted jurisdictional basis for plaintiffs' breach-of-trust claims relating to delay is the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2). The decision in *Menominee* does not apply to plaintiffs' breach-of-trust claim for delay, because plaintiffs are claiming that the Secretary contravened a federal statute, rather than solely claiming enactment of the 1998 Act itself constituted a breach of trust. *See Menominee,* 607 F.2d at 1340 (expressly distinguishing between a claim that a federal official contravened a gov-

erning statute from a claim that Congress itself breached a trust duty by enacting a constitutional statute). There are two issues relating to plaintiffs' breach-of-trust claim for delay. The first issue is whether this Court has jurisdiction under the "Little" Tucker Act, which includes the issue of whether a trust relationship exists between plaintiffs and the United States pursuant to the 1972 Act. The second issue is, even if a trust relationship exists under the 1972 Act, are plaintiffs' breach-of-trust claims barred by the statute of limitations.

### a. Jurisdiction and Existence of a Trust Relationship

 As explained above, because the Tucker Act does not create any substantive right for money damages, a substantive source of law, such as an Act of Congress, must be identified to establish jurisdiction. *See Mitchell,* 463 U.S. at 216–17, 103 S.Ct. 2961. The Supreme Court explained that "there is simply no question that the Tucker Act provides the United States' consent to suit for claims founded upon statutes or regulations that create substantive rights to money damages." *Id.* at 218, 103 S.Ct. 2961. The Supreme Court has "consistently recognized that the existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting for a breach of the trust." *Id.* at 226, 103 S.Ct. 2961. Thus, plaintiffs must demonstrate that a trust relationship exists between them and the United States based on the 1972 Act to establish jurisdiction under the "Little" Tucker Act.

 The 1972 Act requires the Secretary to prepare a roll of lineal descendants and distribute their share of the Judgment Fund. *See* 25 U.S.C. §§ 1300d–3(b) and 1300d–4(c) (1983) (amended 1998). The Supreme Court recognizes the "exis-

tence of a general trust relationship between the United States and the Indian people." *Mitchell,* 463 U.S. at 225, 103 S.Ct. 2961. " '[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.' " *Id.* (quoting *Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980)); *see Blue Legs v. United States Bureau of Indian Affairs,* 867 F.2d 1094, 1100 (8th Cir.1989) (same).

The Eighth Circuit addressed the issue of whether the United States has a trust relationship under the 1972 Act with lineal descendants in *Loudner,* 108 F.3d at 900–01. The plaintiffs in *Loudner* are potential lineal descendants who did not file an application to share in the Judgment Fund prior to the Secretary's original deadline in 1973 because they claim they did not receive notice that the Judgment Fund existed. *See id.* at 901. In discussing the United States' duties under the 1972 Act, the Eighth Circuit held that:

> "[T]here is a presumption that absent explicit language to the contrary, all funds held by the United States for Indian tribes are held in trust." *Rogers v. United States,* 697 F.2d 886, 890 (9th Cir.1983); *see also United States v. Mitchell,* 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983). This obligation derives from "a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of [the Supreme] Court" under which the Government "has charged itself with moral obligations of the highest responsibility and trust" in carrying out its treaty obligations with the Indian tribes. *Semi-*

*nole Nation v. United States,* 316 U.S. 286, 296–97, 62 S.Ct. 1049, 1054–55, 86 L.Ed. 1480 (1942) (footnote omitted). This "trust relationship extends not only to Indian Tribes as governmental units, but to tribal members living collectively or individually, on or off the reservation." *Little Earth of United Tribes, Inc. v. HUD,* 675 F.Supp. 497, 535 (D.Minn.1987), *amended,* 691 F.Supp. 1215 (D.Minn.1988), *aff'd,* 878 F.2d 236 (8th Cir.1989), *cert. denied,* 494 U.S. 1078, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990). In this case, the government points to no statutory language relieving it of these long-established obligations with respect to the lineal descendants of the Sisseton–Wahpeton Sioux. Accordingly, *the government had the obligation to act as a trustee in its management of the judgment fund,* and we must judge its conduct "by the most exacting fiduciary standards." *Seminole Nation,* 316 U.S. at 297, 62 S.Ct. at 1054.

*Loudner,* 108 F.3d at 900–01 (emphasis added).

▮ The 1972 Act clearly imposes fiduciary obligations on the Secretary because the United States retains control over tribal monies while the Secretary is preparing the roll. *See Mitchell,* 463 U.S. at 225, 103 S.Ct. 2961 (holding that the United States has fiduciary obligations when it exercises control over tribal monies or properties); *Loudner,* 108 F.3d at 900–01 (holding that under the 1972 Act the United States owes an obligation to act as trustee in its management of the Judgment Fund). Because the statute clearly establishes fiduciary obligations of the government in preparing the roll of lineal descendants and distributing the funds, it can "fairly be interpreted as mandating compensation by the Federal Government for damages sustained." *Mitchell,* 463 U.S. at 226, 103 S.Ct. 2961. Accordingly, the Court has jurisdiction over plaintiffs' breach-of-trust claim for delay pursuant to the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2).

▮ In addition to challenging jurisdiction and asserting the statute of limitations, the United States seeks summary judgment on the merits of plaintiffs' breach-of-trust claim for delay. The record does not contain any evidence addressing the reasons for delay in preparing the roll of lineal descendants between 1972 and 1987. Thus, genuine issues of material fact exist on the issue of whether the United States breached trust duties between 1972 and 1987.

▮ The United States further asserts that it is entitled to summary judgment on plaintiffs' breach-of-trust claim relating to any delay in distribution from 1987 to 1996, because the Secretary was enjoined from distributing the lineal descendants' share of the Judgment Fund in litigation initiated and pursued by the Tribes to void any distribution to the lineal descendants. *See Sisseton I,* 686 F.Supp. at 832; *Sisseton II,* 895 F.2d at 591. The issue of whether the United States is liable for breach of trust during the pendency of the litigation pursued by the Tribes between 1987 and 1996 will be decided at the same time as the other aspects of plaintiffs' breach-of-trust claim.

*b. Statute of Limitations*

▮ The applicable statute of limitations provides, in pertinent part, that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."[9] 28 U.S.C.

9. This statute of limitations barred the Tribes' challenges to the 1972 Act in *Sisseton I,* 686 F.Supp. at 836–37 and *Sisseton II,* 895 F.2d at 590. The Eighth Circuit also applied this statute of limitations in *Loudner,* 108 F.3d at 900, involving potential lineal descendants claiming they did not receive sufficient notice of the Judgment Fund.

§ 2401(a). The complaint in this action was filed on May 27, 1999. Accrual of plaintiffs' claims is the key issue here. *See Loudner*, 108 F.3d at 900. The term "accrual" for purposes of the statute of limitations "occurs when the plaintiffs either knew, or in the exercise of reasonable diligence should have known, that they had a claim." *Id.* Plaintiffs were notified in 1979 that they were eligible lineal descendants. (Doc. 67, Exhibits A and B.) By virtue of filing their applications to share in the Judgment Fund, they knew a portion of the Judgment Fund was allocated to the lineal descendants by the 1972 Act and that the funds had not yet been distributed when they received their notifications in 1979. But the knowledge of their eligibility and the lack of distribution by 1979 does not necessarily establish that they either knew, or in the exercise of reasonable diligence should have known, that the Secretary's failure to prepare the roll and distribute the funds by 1979 constituted a breach of trust.

 Plaintiffs' breach-of-trust claim for delay in preparing the roll and distributing the funds must be analyzed as two different breaches for purposes of the statute of limitations. The first breach of trust for delay, if any, began in 1972, when the 1972 Act was enacted. The United States contends that the roll was prepared in 1987 and the Secretary was ready to distribute the funds to 1,969 lineal descendants, thereby fulfilling the Secretary's duty under 25 U.S.C. § 1300d–3(b) (1983) (amended 1998). The record before the Court, however, does not contain evidence to conclusively establish that the Secretary did prepare the roll of lineal descendants in 1987. If the roll was prepared in 1987, then a second question arises as to when the plaintiffs knew or should have known that they had a claim for breach of trust for delay in preparing the roll and distributing the funds from 1972 to 1987. The record at this juncture does not contain any evidence to establish that plaintiffs knew or should have known the Secretary prepared the roll and was prepared to distribute the funds in 1987. If it is later established that the Secretary did prepare the roll in 1987 *and* that plaintiffs knew or should have known that they had a claim for breach of trust at any time before May 1993 (which is six years prior to the filing of this action), then plaintiffs' breach-of-trust claim for any delay prior to 1993 would be barred by the statute of limitations. Thus, two genuine issues of material fact exist regarding plaintiffs' first breach-of-trust claim for delay: (1) whether the Secretary prepared the roll of lineal descendants, as required by 25 U.S.C. § 1300d–3(b) (1983) (amended 1998), and was prepared to distribute the lineal descendants' share of the Judgment Fund in 1987; and (2) whether plaintiffs knew or should have known that they had a claim for breach of trust for delay in preparing the roll and distributing the Judgment Fund at any time prior to May 1993 (six years prior to the filing of the complaint in this action).

The second breach of trust for delay, if any, relates to the Secretary's delay in preparing the roll and distributing the funds as required after the Eighth Circuit issued its opinion in *Loudner*, 108 F.3d at 903–04. The statute of limitations clearly has not expired on this aspect of the breach-of-trust claim, because the complaint herein was filed in 1999, well within the six-year statute of limitations. On the record before the Court, genuine issues of material fact exist on the issue of whether the United States has breached trust duties owed to plaintiffs in the preparation of the roll of lineal descendants following the *Loudner* decision. 108 F.3d at 903–04.

### III. CONCLUSION

Plaintiffs' motion to amend the complaint will be granted and their second

motion for judgment on the pleadings will be denied. The Tribes' and United States' motions for summary judgment will be: (1) granted on plaintiffs' claim that the 1998 Act violated plaintiffs' Fifth Amendment rights; (2) granted on plaintiffs' claim that enactment of the 1998 Act itself constituted a breach of trust; and (3) denied on plaintiffs' breach-of-trust claim for delay in preparing the roll of lineal descendants and distributing the Judgment Fund as required by 25 U.S.C. §§ 1300d–3(b) and 1300d–4(c) (1983) (amended 1998). Genuine issues of material fact exist on the following issues: (1) whether the Secretary prepared the roll of lineal descendants, as required by 25 U.S.C. § 1300d–3(b) (1983) (amended 1998), and was prepared to distribute'd the lineal descendants' share of the Judgment Fund in 1987; (2) whether plaintiffs knew or should have known that they had a claim for breach of trust for delay in preparing the roll and distributing the Judgment Fund at any time prior to May 1993 (six years prior to the filing of the complaint in this action); and (3) if either of plaintiffs' breach-of-trust claims for delay are not barred by the statute of limitations, whether the United States breached trust duties owed to plaintiffs' in the preparation of the roll and distribution of the Judgment Fund required by 25 U.S.C. §§ 1300d–3(b) and 1300d–4(c) (1983) (amended 2001).[10] Although the Tribes moved for summary judgment on the breach-of-trust claims, those claims are not asserted against the Tribes and they do not affect the constitutionality or validity of the 1998 Act. Therefore, the Tribes will be dismissed as parties to this action. Accordingly,

IT IS ORDERED:

1. That the plaintiffs' Motion to Amend the Complaint, Doc. 51, is granted.

2. That plaintiffs' Second Motion for Judgment on the Pleadings, Doc. 60, is denied.

3. That the Sisseton–Wahpeton Sioux Tribe, the Spirit Lake Tribe and the Sisseton–Wahpeton Sioux Council of the Assiniboine and Sioux Tribes' Motion for Summary Judgment, Doc. 62, is: (1) granted on plaintiffs' claim that the 1998 Act violated plaintiffs' Fifth Amendment rights; (2) granted on plaintiffs' claim that enactment of the 1998 Act itself constituted a breach of trust; and (3) denied on plaintiffs' breach-of-trust claim for delay in preparing the roll of lineal descendants and distributing the Judgment Fund as required by 25 U.S.C. §§ 1300d–3(b) and 1300d–4(c).

4. That the defendant United States' Motion for Summary Judgment, Doc. 66, is: (1) granted on plaintiffs' claim that the 1998 Act violated plaintiffs' Fifth Amendment rights; (2) granted on plaintiffs' claim that enactment of the 1998 Act itself constituted a breach of trust; and (3) denied on plaintiffs' breach-of-trust claim for delay in preparing the roll of lineal descendants and distributing the Judgment Fund as required by 25 U.S.C. §§ 1300d–3(b) and 1300d–4(c).

5. That the Sisseton–Wahpeton Sioux Tribe, the Spirit Lake Tribe and the Sisseton–Wahpeton Sioux Council of the Assiniboine and Sioux Tribes are dismissed as parties to this action and they shall be deleted from the caption.

6. That the United States and the plaintiffs shall notify the Court, on

---

**10.** The Court will amend the scheduling order to allow a second motion for summary judgment on the remaining issues if the United States or the plaintiffs so desire. Otherwise, a trial date will be set to resolve these issues.

or before October 10, 2001, whether they desire to address the remaining issues in a second summary judgment motion or a trial.